(No. 75388.—

(No. 75575.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellant, v. RICO TAYLOR, Appellee.—THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. RAY HUDSON, Appellant.

*Opinion filed January 19, 1995.*

Roland W. Burris, Attorney General, of Springfield, and Jack O'Malley, State's Attorney, of Chicago (Terence M. Madsen and Arleen C. Anderson, Assistant Attorneys General, of Chicago, and Renee G. Goldfarb, Barbara L. Jones and Theodore Fotios Burtzos, Assistant State's Attorneys, of counsel), for the People.

Michael J. Pelletier, Deputy Defender, and Anna

Ahronheim, Assistant Appellate Defender, of the Office of the State Appellate Defender, of Chicago, for appellee.

Michael J. Pelletier, Deputy Defender, and Patricia Mysza, Assistant Appellate Defender, of the Office of the State Appellate Defender, and Julie A. Bauer and Dane A. Drobny, of Winston & Strawn, all of Chicago, for appellant.

Roland W. Burris, Attorney General, of Springfield, and Jack O'Malley, State's Attorney, of Chicago (Terence M. Madsen, Assistant Attorney General, of Chicago, and Renee G. Goldfarb, Barbara L. Jones and Theodore Fotios Burtzos, Assistant State's Attorneys, of counsel), for the People.

JUSTICE MILLER delivered the opinion of the court:

In these consolidated appeals, we are asked to determine whether the conduct of defendants Rico Taylor and Ray Hudson in the shooting death of Otha Smith was sufficient to convict them of first degree murder under an accountability theory.

Following separate bench trials in the circuit court of Cook County, Taylor and Hudson were found guilty of two counts of first degree murder based on accountability (Ill. Rev. Stat. 1987, ch. 38, pars. 9—1(a)(1), (a)(2)). They were subsequently sentenced to concurrent 20-year terms of imprisonment. Both defendants appealed, arguing, among other things, that there was insufficient evidence to find them guilty of murder on an accountability basis. The appellate court reversed Taylor's

conviction and sentence (244 Ill. App. 3d 152), but affirmed Hudson's conviction (No. 1—91—2102 (unpublished order under Supreme Court Rule 23)). We allowed the State's petition for leave to appeal in case No. 75388 and Hudson's petition for leave to appeal in case No. 75575. (145 Ill. 2d R. 315(a).) The cases were consolidated on appeal.

## FACTS

In August 1988, Hudson, Taylor, and a third defendant, Michael Page, were jointly charged by indictment with two counts of first degree murder (Ill. Rev. Stat. 1987, ch. 38, pars. 9—1(a)(1), (a)(2)) and one count of armed violence (Ill. Rev. Stat. 1987, ch. 38, par. 33A—2). The charges stemmed from the July 20, 1988, shooting death of Otha Smith. On Page's motion, which Taylor joined, the trial judge severed the cases for trial. Subsequently, Hudson and Page were tried separately, but by the same judge, in simultaneous bench trials. Taylor was tried in a bench trial separately by the same judge. The following evidence was adduced at the trials of Hudson and Taylor.

Theresa McCastle was at her father's home, located at 9661 South Brennan, in Chicago, when she heard gunshots. She ran to the front door and observed a white car pull up and four men get out. One of the men started shooting. She identified this man as Herbert Kendricks. She did not recognize the other men.

After Kendricks pointed the gun, McCastle saw the victim, Otha Smith, stagger from the direction in which the shots were fired. Kendricks then ran up to the victim, pointed the gun in his face, and pulled the trigger. The gun jammed and failed to fire. The victim then fell to the ground. McCastle testified that the other three individuals remained standing by the car while the shooting occurred.

Police officers subsequently arrived at the scene of

the shooting and observed four black males standing over the prone body of another black male. Three of the men, including Taylor and Hudson, then ran toward a white car. The fourth man fled in the opposite direction. The three men that were running toward the car were arrested and transported to the police station. The fourth man was arrested separately.

Following his arrest, Hudson made both oral and written statements that were introduced solely against him at trial. After being advised of his *Miranda* rights, Hudson stated that he was a passenger in a car with Kendricks and two other individuals, whom he later identified as Taylor and Page, when Kendricks told Page to pull the car over. After Page complied, Hudson asserted that he and the three others in the car exited the vehicle. Kendricks approached the victim and shot him. Hudson stated that after the shooting he and Kendricks, with the other two individuals, drove around the block and then returned to where the victim was lying. Shortly thereafter, the police arrived, and he was arrested.

According to Hudson's written statement, he was in a car with Page and Kendricks. After the three picked up Taylor, Page said to Taylor, "Let's go get into something." Page then drove to Kendricks' home, where Kendricks went inside. At this time, Page told Hudson that Kendricks' brother had been beaten up and that Kendricks needed their help. In exchange for their help, Kendricks "would help them against somebody who had been causing [Taylor] problems." Page explained to Hudson that Kendricks "wanted the guy who beat up his brother taken out." Hudson stated that he understood "taken out" to mean that Kendricks wanted the man killed. Hudson further stated that Page told him that Kendricks would provide the guns and would let them keep the guns in return for their help.

According to Hudson's statement, when Kendricks returned to the car, Kendricks said that if he found the man who beat up his brother he was going to kill him. Before Kendricks returned, Page stated that "[Kendricks] got a pistol," and Taylor said, "Yeah he do." While they were driving, Page told Hudson that when they found the man they were looking for Hudson was to block him from escaping.

Hudson further explained in his statement that Kendricks directed Page where to drive. When they got to 9760 South Brennan, Kendricks pointed to a young man and told Page to stop. Everyone got out of the car. Kendricks went up to the man that he had pointed to, slapped him and asked him why he jumped his brother. When the man ran, Kendricks chased him while firing shots at him. Hudson asserted that after the victim fell to the ground he, as well as Kendricks, Page and Taylor, returned to the car. They drove to Kendricks' home, where Kendricks got a larger gun. They then returned to where the shooting occurred. As they pulled up, the police arrived, and they ran from Page's car.

Following his arrest, Taylor also made both oral and written statements which were introduced against him at trial. According to Officer Martin Gainer, Taylor stated:

> "[H]e and the other three individuals were in a car. They were driving on Brennan. Saw Smith. The four of them exited the vehicle, approached Smith, Herbert Kendricks produced a weapon, fired at Smith. He went down and three of them got back in the car and drove around the block."

In a statement made to Officer Angelo Pesavento and Detective George Karl, Taylor asserted that he was a passenger in a car driven by Page. Kendricks was sitting in the front passenger seat of the car; Taylor was sitting in the back seat behind the driver; Hudson was sitting in the back seat on the passenger side. When

they were in the area of the shooting, Kendricks told Page that he wanted him to drive around to look for the victim, a Gangster Disciple. Taylor explained that the victim had beaten up Kendricks' brother and that Kendricks wanted to kill the victim. Taylor also stated that he saw Kendricks with a gun while they were in the car.

Taylor further stated that Kendricks directed Page where to look for Gangster Disciples. They drove to the area of 96th Street and Brennan Avenue, where they observed the victim. Kendricks directed Page to pull the car over. Kendricks got out of the car, fired three shots and got back inside the car. They then drove to Kendricks' home, where Kendricks got a larger gun. They then returned to the area where the original shooting had occurred. Kendricks fired another round of shots. The police then arrived, and everyone fled.

Taylor's written statement was essentially the same as his oral statements. According to Taylor's written statement, on the night of the incident, he was picked up by Page, Kendricks and Hudson. Page was driving. After they picked Taylor up, they started to take Kendricks home. Kendricks asked Page to drive around to look for the victim because the victim had "jumped" his brother. Taylor indicated that while they were driving Kendricks said he wanted to kill the victim for "jumping" his brother. Taylor also stated that Kendricks had a gun on his lap. Kendricks directed Page to drive around the block from his home to see if the victim or other Gangster Disciples were there. When the victim was spotted, Kendricks instructed Page to stop the car.

In his statement, Taylor asserted that Kendricks jumped out of the car, chased the victim and shot him. Kendricks then got back in the car, and they drove to Kendricks' home. Taylor explained that they went to Kendricks' home so Kendricks could get another gun.

He indicated that he saw Kendricks shoving the gun down his pants. After getting the gun, Kendricks told Page to drive back around the block. When he got to the scene of the shooting, Kendricks jumped out of the car and shot up in the air once. The police then arrived, and they fled.

After the State rested, Taylor testified on his own behalf. His testimony contradicted his earlier statements to the police. Taylor testified that before the night in question he had never met Kendricks. He further stated that he was unaware Kendricks had a gun until they arrived at the location of the shooting. Taylor maintained that Kendricks did not tell Page why he wanted him to drive around the corner of his house nor did Kendricks ever mention looking for a specific individual. He did assert that Kendricks stated someone had beat up his brother, but denied that Kendricks ever mentioned the victim's name or the specific name of the individual responsible for the beating. He also denied that there was any mention of someone wanting to kill someone or that Kendricks said he was looking for someone who beat up his brother. Taylor asserted that while the shooting occurred he remained in the car. He further testified that Kendricks never asked him to assist in shooting the victim or to participate in "getting" anybody on behalf of Kendricks' brother. He stated that when he arrived at the scene he had no idea that Kendricks was going to shoot anybody.

On cross-examination, Taylor admitted that he was a member of the Vice Lords and that Page, Hudson, Kendricks and Kendricks' brother were also members of the same gang. Taylor denied that he amended or initialled his statement to read that Kendricks told Page to drive around the block "[t]o see if Otha Smith and the other Disciples were there." Taylor also stated that he did not observe Kendricks bring anything back to

the car after they returned to Kendricks' home after the shooting.

Taylor and Hudson were found guilty of both counts of first degree murder. (See Ill. Rev. Stat. 1987, ch. 38, pars. 9—1(a)(1), (a)(2).) Hudson was also found guilty of armed violence, but the trial judge later vacated the judgment on this charge. As to Taylor, the armed violence charge was dismissed. (See Ill. Rev. Stat. 1987, ch. 38, par. 33A—2.) The trial judge later sentenced both Taylor and Hudson to 20-year terms of imprisonment on each count of first degree murder to run concurrently.

Both defendants appealed, alleging, among other things, that there was insufficient evidence to support murder convictions based on accountability. The appellate court affirmed Hudson's conviction for first degree murder under count I of the indictment. The court, however, vacated his conviction and sentence for first degree murder under count II of the indictment (Ill. Rev. Stat. 1987, ch. 38, par. 9—1(a)(2)) because Hudson had been convicted of two counts of murder and only one person was killed. (No. 1—91—2102 (unpublished order under Supreme Court Rule 23).) As to Taylor, the appellate court reversed Taylor's conviction, reasoning that the State did not prove beyond a reasonable doubt that he was guilty of first degree murder under an accountability theory. The court concluded that the evidence proved nothing more than that Taylor was a passenger in the vehicle in which the shooter was present. 244 Ill. App. 3d at 159.

## DISCUSSION

The State argues in case No. 75388 that the appellate court erred in reversing Taylor's conviction. The State contends that there was sufficient evidence to sustain Taylor's conviction of first degree murder under an accountability theory. Specifically, the State maintains

that there was more evidence than mere presence at the scene of the crime. Therefore, the State urges this court to reverse the appellate court.

Hudson argues in case No. 75575 that the trial court erred in finding him guilty under an accountability theory. Specifically, Hudson contends that the evidence at trial established nothing more than that he was present at the scene of the crime and had knowledge of the crime. He argues that presence and knowledge can sustain a conviction under accountability only when combined with additional evidence of wrongdoing. Hudson maintains that such additional evidence is absent. Therefore, his conviction should be reversed.

Under Illinois law, a person is legally accountable for the conduct of another if "[e]ither before or during the commission of an offense, and with the intent to promote or facilitate such commission, he solicits, aids, abets, agrees or attempts to aid, such other person in the planning or commission of the offense." Ill. Rev. Stat. 1987, ch. 38, par. 5—2(c); *People v. Reid* (1990), 136 Ill. 2d 27, 60.

Mere presence of a defendant at the scene of a crime does not render one accountable for the offense. (*People v. Furby* (1990), 138 Ill. 2d 434, 456; *Reid*, 136 Ill. 2d at 61; *People v. Ruiz* (1982), 94 Ill. 2d 245, 256.) Moreover, presence at the scene plus knowledge that a crime was being committed, without more, is also insufficient to establish accountability. (*Reid*, 136 Ill. 2d at 61.) Nevertheless, active participation has never been a requirement for the imposition of criminal guilt under an accountability theory. (*Ruiz*, 94 Ill. 2d at 254.) One may aid and abet without actively participating in the overt act. *People v. Rybka* (1959), 16 Ill. 2d 394, 405.

A defendant may be deemed accountable for acts performed by another if defendant shared the criminal intent of the principal, or if there was a common crimi-

nal plan or purpose. (*Furby*, 138 Ill. 2d at 456; *People v. J.H.* (1990), 136 Ill. 2d 1, 17; *People v. Stanciel* (1992), 153 Ill. 2d 218, 235.) Words of agreement are not necessary to establish a common purpose to commit a crime. The common design can be inferred from the circumstances surrounding the perpetration of the unlawful conduct. (*Reid*, 136 Ill. 2d at 62; *J.H.*, 136 Ill. 2d at 17.) Proof that defendant was present during the perpetration of the offense, that he maintained a close affiliation with his companions after the commission of the crime, and that he failed to report the crime are all factors that the trier of fact may consider in determining the defendant's legal accountability. (*Reid*, 136 Ill. 2d at 62.) Defendant's flight from the scene may also be considered in determining whether defendant is accountable. (*Reid*, 136 Ill. 2d at 62.) Evidence that defendant voluntarily attached himself to a group bent on illegal acts with knowledge of its design also supports an inference that he shared the common purpose and will sustain his conviction for an offense committed by another. *J.H.*, 136 Ill. 2d at 17.

After reviewing the evidence in the light most favorable to the State (see *People v. Schott* (1991), 145 Ill. 2d 188, 203; *People v. Young* (1989), 128 Ill. 2d 1, 48-49), we find that there was sufficient evidence for a rational trier of fact to find Hudson and Taylor guilty of first degree murder under an accountability theory in each of their respective cases. In case No. 75388, the appellate court concluded that Taylor did not participate in any act that contributed to the shooter's objective of murdering the victim. It also found that Taylor did not have a weapon, did not participate in the planning or execution of any plan to murder the victim or provide any instruments in furtherance of that plan. (244 Ill. App. 3d at 158.) However, as previously noted, active participation is not required to find a defendant guilty

of a crime on an accountability theory. *Ruiz*, 94 Ill. 2d at 254.

According to Taylor's statements to the police, he was aware, prior to the actual shooting, that Kendricks wanted to kill Otha Smith, that Kendricks was armed with a weapon, and that Kendricks had instructed Page where to drive to find the victim. Knowing this, Taylor voluntarily stayed with the group. After the shooting, Taylor remained with the group and was aware that Kendricks was going to his house to get another weapon. Moreover, he returned to the scene of the shooting with the group and then fled when the police arrived. Although Taylor gave conflicting testimony at trial as to his knowledge of why Kendricks drove to the scene, whether Kendricks had a gun, and that Kendricks wanted to kill the victim, it was the responsibility of the trier of fact to resolve any conflicting testimony. *People v. Tye* (1990), 141 Ill. 2d 1, 13.

At no time did Taylor discourage Kendricks from killing the victim or indicate his disapproval of the commission of the crime. Not only was Taylor present during the perpetration of the offense, he maintained a close affiliation with Kendricks after the shooting, failed to report the crime, and fled the scene. Therefore, taking into account Taylor's actions surrounding the perpetration of the crime, we find that the trier of fact, the trial judge in this case, could have rationally concluded that Taylor was part of a common design to murder the victim, to which he assented, and therefore was guilty of the murder of Otha Smith based on accountability.

Similarly in case No. 75575, Hudson's statements to the police demonstrated (1) that he was aware of the planned shooting, (2) that he understood that Kendricks was driving around for the purpose of locating the victim, (3) that Kendricks had a gun, (4) that Kendricks wanted his help in shooting the victim, (5) that he was

present during the commission of the offense without disapproving of it, and (6) that he maintained his affiliation with Kendricks after the murder and even returned to the scene with Kendricks without reporting the incident. Moreover, when the police arrived at the scene, defendant attempted to flee from the police. Based on Hudson's statements, it can be concluded that Hudson assented to the commission of the offense, lent his countenance and approval and was thereby aiding and abetting the crime. Consequently, we find the evidence was sufficient to support Hudson's conviction.

## CONCLUSION

For the foregoing reasons, the judgment of the appellate court in No. 75388 is reversed. Because of its resolution of the action, the appellate court in case No. 75388 did not consider additional issues raised by Taylor. We, therefore, remand the cause to the appellate court for consideration of the remaining issues. The judgment of the appellate court in No. 75575 is affirmed.

*No. 75388—Appellate court*
*reversed; cause remanded.*
*No. 75575—Affirmed.*