THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JIMMIE PARKER, Defendant-Appellant.

First District (6th Division)    No. 1—98—0385

Opinion filed November 17, 2000.

---

[1]Justice Zwick, who is no longer on this court, sat on the panel for oral arguments in this cause.

Michael J. Pelletier and Ann C. McCallister, both of State Appellate Defender's Office, of Chicago, for appellant.

Richard A. Devine, State's Attorney, of Chicago (James E. Fitzgerald and Veronica X. Calderon, Assistant State's Attorneys, of counsel), for the People.

JUSTICE O'BRIEN delivered the opinion of the court:

Following a jury trial, defendant, Jimmie Parker,[1] was found guilty of the first degree murder of Chicago police officer Daniel Doffyn, the attempted murder of Chicago police officer Milan Bubalo, the attempted murder of Victor Young and two counts of possession of a controlled substance with the intent to deliver. Defendant was sentenced to natural life imprisonment for first degree murder, 80 years for one attempted murder and 30 years for the other attempted murder to run consecutively to the 80 years, concurrent terms of 25 years and 7 years for possession of cocaine and heroin, respectively, with the 25 years to run consecutively to the 80 years.

On appeal, defendant contends the circuit court erred in: (1) admitting a mannequin wearing the shirt of the victim into evidence and allowing the jury to use the mannequin in the jury room, and (2) allowing improper closing argument by the State. Defendant further contends the evidence was insufficient for the jury to find him guilty beyond a reasonable doubt of the murder of Officer Doffyn and the attempted murder of Officer Bubalo under an accountability theory, to find him guilty of the murder of Officer Doffyn under a felony-murder theory, or to find him guilty of possession of a controlled substance with intent to deliver. We reverse and remand for a new trial.

This case involves two shootings at different times and different locations: the shooting of Victor Young (the first shooting), and later the same day, the simultaneous shooting of Officers Doffyn and Bubalo (the second shooting).

At trial, Victor Young testified that, from 1990 until 1991 or 1992, he sold drugs for Murray Blue at a particular corner where Blue con-

---

[1]In *People v. Blue*, 189 Ill. 2d 99, 724 N.E.2d 920 (2000), the Illinois Supreme Court referred to Jimmie Parker as Jimmy Parker.

trolled drug sales. Young testified that defendant also sold drugs for Blue at that corner in March 1995. Young stopped selling drugs for Blue when Young joined a rival street gang.

Young testified that on March 8, 1995, at approximately 2:30 p.m., he and some friends were walking when he heard Blue yell at him from the first-floor window of an apartment on Maypole Street. Blue accused Young of talking to the police about Blue. Young denied it. Young turned to walk away and Blue called after him. When Young turned back toward Blue, he saw Blue holding a TEC-9. Young started to run and Blue fired at him 14 to 15 times. Several bullets hit Young in the hip or buttocks and he fell to the ground.

Young also testified that, from the ground, he looked behind him and saw Blue, Clyde Cowley and defendant run out of the apartment building. Blue shot at Young again. Defendant then shot at Young with a sawed-off shotgun, but missed. Defendant tried to shoot Young again, but the shotgun jammed. Blue then said, "Let's get out of here. It's getting too hot."

Young saw Blue, Cowley and defendant run through a vacant lot. A few minutes later, Young saw a black Lincoln Continental automobile drive north at 40 miles per hour. Young was taken to the hospital where, after speaking with officers, he identified Blue and defendant as the people who fired at him.

The Lincoln Continental contained Blue, Cowley and defendant, who were fleeing to another apartment.

Chicago police officer Jackson testified that, on the same day at approximately 3:30 p.m., she was at the 15th District police station when she heard a report of a burglary in progress at an apartment across the street from the police station on Lorel Street. She and several police officers responded to the call.

Officer Jackson also testified that, as she approached the building, she saw Officers Bubalo and Doffyn walking to the front of the building. She entered a gangway at the south side of the building, leading toward its rear. As she reached the far end of the gangway, she was approached by two black males. One carried a TEC-9 with his hands extended in front of him. The other male appeared to be unarmed. Jackson keyed in her radio that she had an emergency, pointed her gun at the men, and yelled at them to get on the ground.

The man with no gun, later identified as defendant, raised his hands in the air but did not immediately go to the ground. The other man, later identified as codefendant Murray Blue, turned and started to run. Then, defendant went to the ground and, as he did so, gunfire erupted. Jackson remained behind the wall of the gangway, with her gun trained on defendant, until other officers arrived.

Officer Bubalo testified that he and Officer Doffyn were in the parking lot of the police station when they learned of the suspected burglary across the street. They went to investigate the reported burglary and saw broken glass on the ground from a window next to the entrance of the building. Bubalo testified that he went inside the building followed by Doffyn. Bubalo knocked on the front door of the apartment with the broken window. Bubalo heard the sound of several feet running to the back of the apartment and the sound of breaking glass.

Officer Bubalo further testified that Doffyn ran down the steps from the first-floor landing and out the building. Bubalo followed Doffyn as Doffyn ran from the front of the building to the rear, through a gangway on the north side of the building. When Bubalo entered the gangway, Doffyn was already rounding the far corner of the gangway, into the backyard of the building. According to Bubalo, Doffyn never drew a weapon.

When Bubalo reached the backyard, he saw Doffyn struggling with a black male. Doffyn had the man, whom Bubalo identified in court as codefendant Clyde Cowley, in a "bear hug" and Cowley was trying to break free. Then, Bubalo heard several gunshots fired in quick succession. Doffyn and Cowley fell to the ground, with Doffyn lying facedown on top of Cowley.

Bubalo testified that he felt the shot in his left hip just as Officer Doffyn and Cowley dropped. As he fell to the ground, Bubalo saw Blue running toward him, from "around the corner." Blue fired at Bubalo and Bubalo returned five shots; one struck Blue in the back of the head. This shot caused Blue to fall face forward to the ground.

Then, Bubalo radioed for help, disarmed Blue, and crawled to the aid of Doffyn and Cowley. Bubalo underwent surgery the next day for a total replacement of his left hip.

Paramedic Schultz answered a "shooting call" at 750 North Lorel in Chicago. There, he found Officer Doffyn in critical condition with a bullet wound to the head. The wound ultimately proved fatal. Codefendants Murray Blue and Clyde Cowley, and Officer Bubalo had also suffered gunshot wounds, but they survived their injuries.

Police officers searched the first-floor apartment with the broken front window. They discovered that the window of the rear door to the apartment had also been broken. Not knowing whether there were other offenders inside, they entered and searched the apartment. No one was inside. In the living room, they found several bags of marijuana on a table and a jacket with .38-caliber bullets in its pocket. In the bedroom, they found plastic bags containing rock cocaine and folded tin packets containing heroin. Also in the bedroom were $5,385

in cash, a scale and a razor blade. An open box of nine-millimeter cartridges lay on the bed. They did not see any mail, receipts, bills or other papers connecting defendant to the apartment.

During trial, the State displayed Officer Doffyn's uniform on a life-size, headless mannequin, which was sent to the jury room during deliberations. Defense counsel did not object to the mannequin being sent to the jury room but had filed a pretrial motion *in limine* to bar its display throughout trial. That motion was denied, but the circuit court directed the State to "keep it off to the side" in court.

Defendant gave a written statement consistent with the State's proof as to the shooting of Young (the first shooting). The written statement also stated that defendant put the shotguns under the bed in the bedroom and retrieved some beer from the kitchen after they arrived at the apartment and that defendant told Blue and Cowley that police had arrived. The statement also stated that when police knocked on the door, defendant wanted to grab a gun but did not have enough time and, further, that when Blue said "they were all in this" defendant knew that Blue meant they were not going to get caught and would shoot it out. Cowley and Blue grabbed weapons and all three jumped out the window together.

Defendant testified at trial *inter alia* that when police began to arrive at the apartment, he wanted to escape because he thought Cowley and Blue would have a shoot-out with police. He did not want to get caught and lowered himself out of the window while Blue and Cowley were still in the apartment. He then ran into the alley but turned around to head to the car. He escaped from the apartment, unarmed and ahead of his codefendants. Further, defendant testified he was stopped by a police officer before the second shooting involving Officers Doffyn and Bubalo.

Following denial of a posttrial motion and sentencing, defendant appealed.

First, and most importantly, the supreme court addressed similar issues of a codefendant in *People v. Blue*, 189 Ill. 2d 99, 724 N.E.2d 920 (2000). In *Blue*, the supreme court found that (1) the prejudicial effect of admitting the mannequin bearing the shirt of Doffyn and allowing it into the jury room outweighed the probative value of the uniform as corroborative evidence of the placement and nature of the officer's injuries; (2) the prosecutor's argument that the officer's family needed to "hear" from the jury was error; (3) the prosecutor's statement to the jury to send a message to all police was error; (4) the prosecutors' "testifying" objections were improper attempts by prosecutors to introduce evidence through themselves; and (5) the cumulative effect of the trial errors deprived Blue of his right to a fair trial.

The supreme court stated:

> "These are not just bloody clothes, but the clothes of a police officer, which, as the defendants noted in *Burrell*, 228 Ill. App. 3d at 144 are uniquely 'charged with emotion.' Critically, too, the jury knew that the stains on the uniform were not only from the officer's blood—a concept disturbing in and of itself—but also from the officer's brains. The latter fact presumably intensified the already inflammatory nature of the garments.
>
> Additionally, the jury was allowed an extended period of exposure to the life-size mannequin that wore the uniform. They saw the mannequin in the courtroom during the testimony of several witnesses, and then were allowed an even closer exposure to the exhibit during their deliberations. By furnishing the jurors with gloves, moreover, the trial court appeared to encourage the jury to engage in a tactile interaction with the uniform.
>
> The nature and presentation of the uniform rendered the exhibit so disturbing that its prejudicial impact outweighed its probative value. Its admission into evidence was error." *Blue*, 189 Ill. 2d at 126, 724 N.E.2d at 934.

Our supreme court has reviewed a similar, though not identical, record of codefendant Blue and reversed his conviction despite overwhelming evidence of his guilt in that he was found to have actually shot the victims. Here, defendant is not alleged to have shot the victims, but he was tried under an accountability theory where the evidence is more closely balanced than the evidence against Blue. The record before this court is nearly identical in that it pertains to the same crime and was tried in a similar fashion on the same theories as the trials of the codefendants.

The State contends that the mannequin issue has been waived by defendant for failure to include it, or a photograph of it, on appeal. There is no disagreement that the mannequin here is the same mannequin in *Blue* and was displayed in the same fashion as in *Blue*. The supreme court has found the mannequin and its display to be error and we are bound by that finding. Thus, the State's contention is without merit.

Because the supreme court reviewed a similar record and found error as to identical evidence and similar tactics as evidence in this record, and found that Blue did not receive a fair trial despite overwhelming evidence of his guilt, we are bound by the findings of the supreme court that the errors were so fundamental to the integrity of the judicial process and of such magnitude that the accused here was denied a fair trial. Accordingly, this defendant's convictions should be reversed as he was denied a fair trial.

However, defendant contends that a remand of these proceedings

is inappropriate as he contests the sufficiency of the evidence to find him guilty beyond a reasonable doubt. First, defendant specifically contends that there was insufficient evidence to find him guilty of the offenses charged based upon accountability. A person is legally accountable for another's criminal conduct when "[e]ither before or during the commission of an offense, and with the intent to promote or facilitate such commission, he solicits, aids, abets, agrees or attempts to aid, such other person in the planning or commission of the offense." 720 ILCS 5/5—2(c) (West 1994); *People v. Dennis*, 181 Ill. 2d 87, 96, 692 N.E.2d 325 (1998). To prove that the defendant possessed the intent to promote or facilitate the crime, the State must present evidence which establishes beyond a reasonable doubt either that the defendant shared the criminal intent of the principal or that there was a common criminal design. *In re W.C.*, 167 Ill. 2d 307, 337, 657 N.E.2d 908 (1995); *People v. Stanciel*, 153 Ill. 2d 218, 234-35, 606 N.E.2d 1201 (1992).

The common design rule provides that where two or more persons engage in a common criminal design or agreement, any acts in the furtherance of that common design committed by one party are considered to be the acts of all parties to the design or agreement and all are equally responsible for the consequences of the further acts. *People v. Perez*, 189 Ill. 2d 254, 267, 725 N.E.2d 1258, 1265 (2000); *W.C.*, 167 Ill. 2d at 337. Words of agreement are not necessary to establish a common purpose to commit a crime. *People v. Taylor*, 164 Ill. 2d 131, 141, 646 N.E.2d 567 (1995). Accountability may be established through a person's knowledge of and participation in the criminal scheme, even though there is no evidence that he directly participated in the criminal act itself. *W.C.*, 167 Ill. 2d at 338. Proof that the defendant voluntarily attached himself to a group bent on illegal acts, was present during the perpetration of the offense, fled from the scene, maintained a close affiliation with his companions after the commission of the crime, and failed to report the crime are all factors that support an inference that the defendant shared a common purpose and will sustain a conviction for an offense committed by another. *Taylor*, 164 Ill. 2d at 141. Thus, intent may be inferred from the character of defendant's acts as well as the circumstances surrounding the commission of the offense. *Stanciel*, 153 Ill. 2d at 234. Further, in assessing whether the evidence against a defendant was sufficient to prove guilt beyond a reasonable doubt, a reviewing court must determine whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Taylor*, 186 Ill. 2d 439, 445, .712 N.E.2d 326 (1999); *People v. Batchelor*, 171 Ill. 2d 367, 376, 665 N.E.2d 777 (1996).

Here, the evidence established that defendant worked for Blue selling drugs, that he agreed to join forces with Blue and Cowley to protect their drug territory by killing a rival dealer, that he was armed with a sawed-off shotgun when he ran outside with Blue and Cowley at the first shooting, and that he fired the weapon at Young. The evidence also established that defendant never separated from Blue and Cowley, that they left the scene of this first shooting together, that their purpose to assault their rival continued after their departure, that they remained together until police arrived and that all these actions were in furtherance of their drug activity. Defendant, Blue and Cowley then tried to escape the apartment. When fleeing the apartment defendant was unarmed, but he later admitted to police that he wanted to be armed. As defendant, Blue and Cowley attempted to escape, a second shooting occurred in which Officer Doffyn was killed and Officer Bubalo wounded. When this evidence is viewed in the light most favorable to the State, it is clear that a rational trier of fact could have found that defendant not only actively participated in the entire series of events but intended to aid in the commission of all the crimes, including possession of the controlled substances, with which he was charged.

Next, defendant claims there was insufficient evidence to prove him guilty beyond a reasonable doubt of felony murder. The jury received accountability instructions for each of the charged offenses, including intentional/knowing murder, and returned a general verdict of guilty. A general finding of guilty is presumed to be based on any good count in the indictment to which the proof is applicable. *People v. Lymore*, 25 Ill. 2d 305, 307-08, 185 N.E.2d 158 (1962). When a jury returns a general verdict of guilty after being instructed on intentional, knowing and felony murder arising out of a single transaction, the presumption exists that the jury found defendant guilty of the intentional murder. *People v. Thompkins*, 121 Ill. 2d 401, 521 N.E.2d 38 (1988). See also *People v. Shatner*, 174 Ill. 2d 133, 150-51, 673 N.E.2d 258 (1996) (holding that presumption arises when general verdict is supported by indictment establishing that the fact finder at the guilt phase was instructed on all three bases for murder). Where charges of intentional, knowing, and felony murder have been proved, intentional murder is deemed to be the most serious offense. *People v. Guest*, 115 Ill. 2d 72, 104, 503 N.E.2d 255 (1986). Here, there was sufficient evidence to support defendant's conviction for intentional murder on an accountability theory. Thus, there is no need to address the issue of felony murder.

Because we find the evidence in the record was sufficient to support defendant's convictions, there is no double jeopardy bar to retrial.

*People v. Birdsall*, 172 Ill. 2d 464, 480, 670 N.E.2d 700, 708 (1996); *People v. Mink*, 141 Ill. 2d 163, 173-74, 565 N.E.2d 975, 979-80 (1990).

Because we reverse in accordance with *People v. Blue*, 189 Ill. 2d 99, 724 N.E.2d 920 (2000), we need not consider defendant's remaining contentions of error.

Accordingly, we reverse and remand for proceedings not inconsistent with this opinion.

Reversed and remanded.

BUCKLEY and ZWICK, JJ., concur.[2]

---

[2]Justice Zwick, who is no longer on this court, sat on the panel for oral arguments in this cause.