2022 IL App (2d) 200790-U
No. 2-20-0790
Order filed June 8, 2022

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of McHenry County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 18-CF-931 |
| JUAN C. SANCHEZ-CACHO, | ) ) ) | Honorable Michael E. Coppedge, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE HUDSON delivered the judgment of the court.
Justices Hutchinson and Brennan concurred in the judgment.

**ORDER**

¶ 1    *Held*: In prosecution on drug charges, defendant could show no prejudice from trial counsel's alleged ineffectiveness in calling defendant's former codefendant to testify that he and defendant "worked" for a third party at a warehouse, which the State's evidence showed was a distribution center for illegal drugs. Although codefendant's testimony was inculpatory in some respects, its absence would not have changed the result at trial where the State produced abundant evidence that defendant was knowingly involved in drug trafficking at the warehouse and was legally accountable for codefendant's possession of drugs discovered when he was stopped by the police after leaving the warehouse.

¶ 2    After a bench trial, defendant, Juan C. Sanchez-Cacho, was convicted of possession of 900 grams or more of a substance containing cocaine with the intent to deliver (720 ILCS

570/401(a)(2)(D) (West 2018)) and sentenced to 18 years' imprisonment. On appeal, he contends that his trial counsel was ineffective for calling a former codefendant, Ivan Moreno-Gollegos (Moreno). We affirm.

¶ 3                                    I. BACKGROUND

¶ 4      The State filed a four-count indictment against defendant and Moreno. Each was charged with both possession of 900 or more grams of a substance containing cocaine with the intent to deliver and simple possession of 900 or more grams of a substance containing cocaine (*id.* § 402(a)(2)(D)). The date of the alleged offenses was September 20, 2018. Before defendant's trial began, Moreno pleaded guilty to possession with the intent to deliver and was sentenced to 16 years' imprisonment. He did not appeal.

¶ 5      We turn to the trial evidence. Ryan Monaghan, a Kane County sheriff's deputy, testified on direct examination as follows. In September 2018, he was working with the Drug Enforcement Administration (DEA) task force investigating a possible cocaine distribution network in the area. Early in September, Monaghan helped conduct security for a meeting between George Brown, a Chicago police detective posing as a prospective cocaine purchaser, and defendant and Moreno. The meeting took place at an Elgin restaurant. After the meeting ended, Monaghan left the area.

¶ 6      Monaghan testified that, on September 20, 2018, Chicago police detective sergeant John Hamilton called him and asked him to drive north to the area of Trinity Drive in Lake in the Hills and to look out for a red Toyota Camry. As he approached his destination, a warehouse, Monaghan saw the Camry drive south, so he turned around and stopped it for traffic violations. Moreno, the driver, was alone. A consensual search of the car revealed that inside the trunk were two boxes, one originally for holding speakers and another with a used cooler inside. Monaghan secured the boxes in his squad car and joined Hamilton and another deputy near the warehouse.

¶ 7    Monaghan testified that Hamilton opened the boxes and found multiple one-kilogram bricks of apparent cocaine inside. The task force obtained a warrant to search the warehouse. The warehouse showed no signs of being used for any legitimate business purpose. Inside, it was "just a large open room" with a small office in front. The office contained a clipboard with some papers but no office equipment. The large room contained numerous pallets. Two vehicles were in the back. The pallets contained used or damaged consumer goods. These items appeared to be a "cover load," legal items used to make a shipment of contraband look legitimate.

¶ 8    Monaghan testified on cross-examination as follows. He did not prepare any police report in connection with the Elgin meeting, because other agents were the reporting officers for the day. The report for the debriefing would have been written by the undercover agent or the DEA. On September 20, 2018, Hamilton did not tell him to look for a semi-truck. Monaghan's police report for that day did not mention the call from Hamilton, the details of Hamilton's examination of the two boxes, or Monaghan's participation in the search. No other drugs were recovered from the warehouse.

¶ 9    On redirect, Monaghan testified that he was not the primary surveillance officer at the Elgin meeting or the primary evidence officer on September 20, 2018. His reports documented whatever he did alone, but as a rule, he did not document occurrences if someone else was leading a group of law enforcement officers.

¶ 10    Jeremy Bruketta, a sergeant with the McHenry County Sheriff's Office, testified that he participated in the search of the warehouse using Sage, a drug-sniffing dog. After Monaghan finished searching, Bruketta entered. Sage alerted to one pallet, so Monaghan and others searched all the pallets. Sage alerted to drug residue on another pallet. The two vehicles in the back of the warehouse were a Honda Accord and a Dodge pickup. Sage alerted to both. Inside the Accord,

Bruketta found an improvised "trap" under the front floorboard, of the type customarily used to hide contraband. Two coolers were found in the back of the Dodge pickup.

¶ 11    Jeremy Draftz, a Lake in the Hills police officer, testified that he was the evidence officer and photographer for the task force on September 20, 2018. The speaker box from the Camry held 10 bundles of suspected cocaine. The cooler held six such bundles. The agents took four vehicles into custody: the Camry, the Accord, the Dodge pickup, and a black Chevrolet HHR that arrived on the scene after the agents had started their work. The Accord had traps under both front seats, and the Dodge pickup contained coolers and empty shells from coolers. Numerous other old coolers with hidden compartments were found inside the warehouse at the back of the vehicles. The pallets each contained numerous consumer items and each contained a charcoal block, which is sometimes used to deter dog sniffs.

¶ 12    Draftz testified that he took numerous photographs, which the trial court admitted into evidence. The clipboard had the name "Justin" written on it, and it held six MoneyGrams. Two had unclear dates; the other four had September dates. Draftz did not investigate who was the payor or payee of any of the MoneyGrams. At the sheriff's office, a sample from each of the 16 one-kilogram bundles field-tested positive for the presence of cocaine.

¶ 13    Draftz testified that the four seized vehicles were taken to a McHenry County sheriff's facility. The DEA told the sheriff's department that the HHR was not part of the investigation and could be released. Draftz learned that the Camry was registered to Cesar Santibanez at two addresses. Draftz could not find a registered owner or licensed driver named Cesar Santibanez. The first address on the registration was an industrial park in Elgin; the second was 9256 Trinity Drive in Lake in the Hills, an industrial park that included the warehouse. Draftz identified a photograph of the warehouse's large entrance door and two smaller loading-dock doors. Aside

from the office and the open room, the warehouse contained a smaller room that was completely empty.

¶ 14    Hamilton testified on direct examination as follows.  He was in charge of security for Brown's undercover meeting.  From nearby, Hamilton saw Brown enter the restaurant.  The red Camry pulled up.  Two men, one young and one middle-aged, exited the car and entered the restaurant.  After Brown and the two men left the restaurant, Hamilton and several other agents followed the Camry to a house in Carpentersville.  For several days, agents including Hamilton kept the house under surveillance.  They saw no vehicles other than the Camry park there.  Nobody other than the two men who had met with Brown entered or exited the house.

¶ 15    Hamilton testified that, at about 7:15 a.m. on September 20, 2018, just as he was pulling into his customary surveillance location, the Camry pulled away.  Hamilton and other agents followed it to the warehouse in Lake in the Hills.  Hamilton parked so that he could see the warehouse.  A semi-truck was backed up to one of the loading-dock doors.  Hamilton moved his vehicle twice to keep the warehouse in view.  Hamilton identified photographs of the warehouse, taken from all three locations.

¶ 16    Hamilton testified that, when he arrived at the warehouse, the Camry was there.  At that time, the two men whom he recognized from the restaurant meeting emerged and used keys to open the warehouse service door and enter the warehouse.  At trial, Hamilton identified defendant as the older of the two men.  The semi-truck was still backed up to a loading-dock door. Shortly afterward, the truck drove away.  Believing that the truck had offloaded contraband to be picked up, Hamilton focused on the warehouse.  Soon, defendant came out of the warehouse, got into the Camry's driver's seat, then immediately got out and reentered the warehouse.  Shortly afterward, the other man came out, closed the service door, went to the Camry, and put a speaker box and a

box holding a cooler into the trunk. Defendant was still inside the warehouse. He pulled back a curtain from inside the service door and looked out. Hamilton did not see anybody else exit the warehouse.

¶ 17    Hamilton identified a State exhibit as a photograph that he took of defendant using keys to open the service door to the warehouse. He identified another State exhibit as a photograph of defendant exiting the service door.

¶ 18    Hamilton testified that there was also a black HHR on the scene. The driver conversed with the driver of the semi-truck before the latter drove away. The HHR also left. Hamilton made his call to Monaghan, who arrived as the Camry was pulling out. The younger man was the Camry's sole occupant, and defendant was still inside the warehouse. The HHR returned, and defendant exited the warehouse and sat in the passenger seat of the HHR. Hamilton and other agents blocked in the HHR and detained the occupants. After participating in a protective sweep of the warehouse, which required unlocking the service door, Hamilton inspected the boxes that had been seized from the Camry.

¶ 19    Hamilton testified on cross-examination as follows. He did not prepare any police reports in connection with the investigation. He explained that he and his subordinates were assisting in the DEA investigation and that all of his activities would have been documented in the DEA's reports. The restaurant meeting was approximately two weeks before September 18, 2020. The semi-truck was parked at the warehouse for perhaps 45 minutes after he arrived there. The HHR had Ohio license plates but Hamilton did not run a check on them.

¶ 20    On redirect examination, Hamilton testified that he decided not to focus on the semi-truck after it left the warehouse, because he did not know whether the driver was simply an innocent third party being used by the suspected drug traffickers.

¶ 21    Brown testified on direct examination as follows.  At the Elgin restaurant meeting, he first met in the parking lot with two people who arrived in a red Camry.  At trial, Brown identified defendant as the older of the two men.  Inside the restaurant, he sat down with the two men.  Brown testified further as follows:

"Q. Did you have a conversation with the defendant?

A. Yes.

Q. And what, if anything, did you say to him and what did he say to you?

A. We discussed pricing of kilos and how many I wanted and how many I could provide.

Q. And when you say kilos, what are you referring to?

A. Narcotics.

Q. Do you remember how many he said he could provide?

A. I believe he told me he could provide 30.  I told him I didn't need that many.

Q. Did he give you a price?

A. Yes.

Q. Do you recall what that was?

A. $30,000 per kilo.

Q. Did he indicate to you when that cocaine would be available?

A. He said he would let me know.  A day or two.

* * *

Q. Did both of the individuals speak with you that day?

A. The other gentleman did not speak.  He just greeted me and that was it."

¶ 22    Brown testified that defendant spoke in English.

¶ 23    Brown testified on cross-examination that he did not remember the exact date of the restaurant meeting. He was never told to write a report of the meeting and never did.

¶ 24    Special Agent Luke Murphy of the DEA testified as follows. At some point, he and other agents engaged in two or three 12-hour days of surveilling the Carpentersville house. During the surveillance, he saw the two men who had met with Brown; in court, he identified defendant and Moreno as these men. At the house, defendant seldom stepped outside. Moreno occasionally left to pick up food and bring it back to the house. Murphy and his subordinates never ascertained who owned the house or whether it was being leased.

¶ 25    Murphy testified that, on September 20, 2018, he and Hamilton detained the occupants of the HHR. They were defendant and Justin Point. The HHR had Ohio license plates and was registered to Chad Gonzalez, but Murphy did not recall anything more about Gonzalez. On September 20, 2018, Murphy did not see defendant do anything other than exit the warehouse and enter the HHR. Nobody from the task force located the semi-truck after it departed the warehouse. Murphy prepared a report for that day but did not ask other agents to do so.

¶ 26    Jeff File, an Illinois State Police master sergeant, testified as an expert in street-level drug distribution. He opined that the street value of the cocaine recovered from the two boxes was approximately $1.6 million, proving that it had been possessed with the intent to deliver and distribute. Martin Skelcy, a forensic scientist with the Illinois State Police Crime Laboratory, testified that one of the bricks weighed 992.1 grams and that a sample of it tested positive for cocaine.

¶ 27    The State rested. Through a translator, Moreno testified on direct examination as follows. He spoke very little English, which he had learned only since being incarcerated. On September 20, 2018, he was residing in Carpentersville. That day, he traveled to Lake in the Hills because

Point had told him and defendant to do so. At that time, he had met defendant only a few days before they "had gone to work with [Point]." Asked whether he had been friends with defendant, Moreno testified, "No. No. I wasn't friends with him. I didn't know him very well." Asked again why he and defendant went to Lake in the Hills, Moreno testified, "We were going to help Mr. Point to work. Like I said, we were working." Point had stopped by the house to tell the two men because Moreno did not speak English.

¶ 28 Moreno testified that, when he arrived at the warehouse, Point and the semi-truck were already there. The truck was backed up to the warehouse. Point told Moreno and defendant to unload the things that were inside the trailer. Moreno later unloaded the two boxes from the trailer and placed them into the Camry. Defendant did not help him carry the boxes to the Camry. At that time, defendant was inside the warehouse; when Moreno went outside, defendant was in the office. When Moreno drove away, defendant was inside.

¶ 29 Moreno testified that Point paid him for doing "work" in the warehouse. He did not know whether defendant got paid. He agreed with counsel that he and defendant reported to the warehouse "to do work that day."

¶ 30 On cross-examination, Moreno testified that, almost a year before September 20, 2018, he entered the United States illegally from Mexico because the New Generation cartel in Mexico forced him to do so. The "work" he did at the warehouse was for the cartel. The Camry and the Carpentersville residence were provided by the cartel. On redirect, Moreno testified that he did not know whether defendant worked for the cartel.

¶ 31 In its closing argument, the State contended that the evidence proved that defendant was accountable for Moreno's possession of the cocaine that the task force recovered on September 20, 2018. The State noted that, at the restaurant meeting with Brown, defendant negotiated the

sale terms and sealed the deal while Moreno said nothing; based on this alone, the State reasoned, defendant aided and abetted Moreno. Further, the State argued that there was a clear nexus between the meeting and the events of September 20, 2018. Multiple witnesses identified defendant as being present and involved in both as well as residing with Moreno at the Carpentersville house at all pertinent times. The State noted Moreno's testimony that the cartel had provided the house and the Camry and that he and defendant drove to the Elgin meeting and later to the Lake in the Hills warehouse. At the latter location, defendant unlocked the door to the warehouse and stayed behind keeping a lookout as Moreno left the warehouse and then drove away in the Camry. The cartel would not have let him unlock and enter the warehouse had he not been its agent in the transportation of $1.6 million worth of cocaine that day. Moreover, the warehouse was not being used for any legitimate business, so defendant knew the illegitimate purpose for which it was being used.

¶ 32    Defendant argued that it was curious that the DEA agents let the semi-truck depart unfollowed and let Point go even though he was clearly involved in the cocaine delivery. As for the Elgin meeting with Brown, defendant had not been charged with committing any offense early in September in Kane County. Finally, there was no evidence that he had any criminal involvement in the events of September 20, 2018. Moreno testified that he did not know whether defendant was a member of the cartel and that all of his instructions had come from Point. All defendant had done on September 20, 2018, was to leave a house, get a ride to a warehouse, stay there a while, and look out a window.

¶ 33    In finding defendant guilty, the trial court stated as follows. First, Brown testified credibly about his meeting in Elgin with defendant and Moreno, and the court accepted in full his account of the meeting. Next, the State had proved the nexus between the meeting and the events of

September 20, 2018. The credible testimony of Hamilton and other officers showed that the Carpentersville house had been surveilled extensively for several days up to the moment when the Camry that defendant and Moreno had taken to the meeting with Brown departed the house and went directly to the warehouse in Lake in the Hills. Several task force members testified that defendant was present at the warehouse and remained there throughout the crucial events.

¶ 34    The court stated that the photographic evidence was extremely incriminating. It (and Hamilton's testimony) proved that defendant used a key for access to the warehouse. From this fact, it followed that, at some point before September 20, 2018, he was given a key to the warehouse. Thus, September 20, 2018, was not the first day that he had been there. Moreno testified that, after he and defendant entered the warehouse, they unloaded the two boxes from the trailer. Notably, there was no testimony as to what Moreno knew about the contents of the boxes.

¶ 35    The court noted next that the photographic evidence proved that, on September 20, 2018, the warehouse was not "an operational warehouse." There were no indicia of an ongoing business, not even a telephone. Moreover, there were numerous cooler boxes with hidden storage compartments, similar to the cooler box that had been seized from the Camry.

¶ 36    The court noted further that Moreno had testified on direct examination that he was not a friend of defendant but merely an acquaintance. That was "a point of significance in some regard to the Court"; if the two men resided in the same house but were not friends, it suggested that they had some sort of a "business relationship." Further, the task force's allegedly lax treatment of Point and the departing semi-truck did not affect the evidence of defendant's involvement in the criminal enterprise and his accountability for Morales' possession of the large quantity of cocaine intended for distribution. Finally, if defendant and Morales had been called to the warehouse only

"for purposes of working" there at Point's request, there would have been no reason for Morales to take items that he had unloaded from the semi-truck, place them into the Camry, and drive away.

¶ 37    The court reasoned that, in deciding whether defendant had abetted Moreno's possession of the cocaine, it could properly consider defendant's "close affiliation with others known to be involved in the crime." The close affiliation of defendant with Moreno was the only reasonable interpretation of the evidence: defendant and Brown negotiated the terms of the upcoming cocaine sale while Moreno sat silently. Further, the evidence easily proved that defendant closely attached himself to the common venture being undertaken: the purchase of cocaine by Brown from defendant, Moreno, or both. Thus, the State had met its burden to prove defendant's guilt by accountability.

¶ 38    The court found defendant guilty of both counts against him. Later, it vacated the count of simple possession and sentenced defendant to 18 years' imprisonment for possession with intent to deliver. He timely appealed.

¶ 39                                   II. ANALYSIS

¶ 40    Defendant contends that his trial counsel was ineffective for calling Moreno as a witness. Defendant contends that the decision to call Moreno was not reasonable trial strategy, because counsel should have anticipated the result of his testimony. According to defendant, Moreno testified to no potentially exculpatory facts that had not already been brought out by State witnesses, but he did offer damaging facts that had not been elicited from any other State witness. Defendant contends that counsel's unprofessional error prejudiced him because Moreno's testimony helped to prove that he was accountable for Moreno's criminal acts on September 20, 2018.

¶ 41    We hold that defendant's claim of ineffective assistance fails because he cannot establish prejudice.  The trial court's explanation of its finding shows that, although Moreno did provide some testimony that harmed defendant, the court would still have found defendant guilty under a theory of accountability even had it not heard a word from Moreno.  Further, the record shows that the court's decision was firmly grounded in the State's evidence.

¶ 42    To prevail on a claim of ineffective assistance of counsel, a defendant must show that (1) counsel's performance fell below an objective standard of reasonableness and (2) it is reasonably probable that, but for counsel's unreasonable performance, the result of the proceeding would have been different.  *Strickland v. Washington*, 466 U.S. 668, 688, 694 (1984); *People v. Johnson*, 2013 IL App (2d) 110535, ¶¶ 41, 57.  Because both prongs must be met (*People v. Theis*, 2011 IL App (2d) 091080, ¶ 39), we may reject an ineffective-assistance claim solely because the prejudice prong has not been satisfied.

¶ 43    The issue here was whether defendant was legally accountable for Moreno's possession of cocaine, with the intent to deliver, on September 20, 2018.  (There has never been any issue of Moreno's guilt as a principal of this charge.)  To prevail on an accountability theory, the State must prove that, either before or during the commission of an offense, and with the intent to promote or facilitate that commission, the defendant solicited, aided, abetted, agreed, or attempted to aid in the planning or commission of the offense.  720 ILCS 5/5-2(c) (West 2018).  Mere presence at the scene of the offense, even when combined with the knowledge that a crime was being committed, will not by itself prove accountability.  *People v. Taylor*, 164 Ill. 2d 131, 140 (1995).  However, one can be accountable for an offense even without actively participating in the overt act.  *Id.*  A defendant can be accountable for the acts of another if he shared the principal's intent, or if there was a common criminal plan or purpose.  *Id.* at 140-41.  The existence of a

common purpose need not be proved by words of an agreement but may be inferred from the circumstances surrounding the perpetration of unlawful conduct. *Id.* at 141.

¶ 44    Here, we need only read the trial court's explanation of its finding of guilt to be satisfied that it would have reached the same decision had Moreno never testified.  The court recognized the conclusiveness of the State's evidence and dwelled only secondarily on Moreno's testimony.  The State's evidence, in light of the court's credibility determinations and the inferences that it drew, clearly proved that defendant aided and abetted Moreno's possession of the cocaine with the intent to deliver it, beyond a reasonable doubt.

¶ 45    To begin with, the court fully credited Brown's account of his meeting with defendant and Moreno.  By this account, defendant negotiated the deal that led to the events at the warehouse later that month.  Defendant did all the talking for his side, telling Brown that he and Moreno would procure and arrange for the delivery of a set quantity of cocaine. As the State contended at trial, this testimony by itself proved that defendant aided and abetted Moreno's criminal acts of September 20, 2018.  At the very least, defendant's conduct all but compelled the inference that, when he rode to the warehouse with Moreno, he knew that the cocaine was there and intended to assist Moreno in securing it for the would-be purchaser.

¶ 46    Defendant contends that Brown's testimony was inconclusive because he did not file a police report, casting doubt on his credibility.  Defendant's challenge to the witness's credibility was a reasonable strategy at trial but has nothing to do with showing that trial counsel's alleged error had any effect on the outcome of the trial.  The trial court was fully aware that Brown did not file a police report, but it properly accepted his testimony in full anyway.  That decision was independent of Moreno's testimony.  Given the damning character of Brown's testimony, the

court likely would have found defendant accountable for Moreno's acts of September 20, 2018, even without more evidence on the issue.

¶ 47   There was, of course, far more such evidence, other than that supplied by Moreno. Defendant and Moreno resided together in a house.  Task force agents kept the house under surveillance for several days and saw nobody else enter or exit the house and Moreno and defendant do so no more than necessary.  On September 20, 2018, Moreno and defendant rode together directly to the warehouse in Lake in the Hills.  As defendant concedes, the warehouse served no legitimate business purpose and was used solely to receive and distribute contraband. Thus, it was undisputed that defendant did not accompany Moreno to the warehouse to do legitimate business or honest work.  Either (1) he did so to aid and abet in the distribution of the cocaine that was shipped there that day or (2) he did so out of complete innocence or, at the very most, the knowledge that Moreno was going to engage in a criminal enterprise in which defendant would play no role.

¶ 48   The State's evidence, as credited by the trial court, left no room for option (2).  Defendant's conduct after he arrived at the warehouse with Moreno proved to the court's satisfaction that he was not an innocent bystander or even a knowing but uninvolved one.  First, as depicted in State photographic evidence, defendant happened to have a key to unlock the service door to the warehouse.  Since defendant was not there to do an honest day's work, the obvious and logical inference that the trial court drew from defendant's possession and use of the key was that he was part of the common venture to unload and carry away the shipment of cocaine that had arrived. A mere bystander would not have a key to a building that was being used solely as a contraband transshipment point.  The trial court reasonably inferred that defendant had been to the warehouse before, which meant that he knew that it was an instrumentality of crime and nothing more.

Moreover, even were this defendant's first trip to the warehouse, his possession of the key strongly implied that the person who controlled the building had given him the key to use for only one reason—as a trusted member of the common venture, defendant would play his role in carrying it out.

¶ 49    Second, after Moreno departed with the two boxes of cocaine, defendant stayed behind in the warehouse and kept a lookout.  Had he been a mere bystander, he would not have had any reason to remain inside.  Third, defendant did not depart with Moreno, his ride to the warehouse. Instead, he conferred with Point, whose conduct compelled the inference that he too was part of the common venture to ship the cocaine to the warehouse and to distribute it from there.

¶ 50    In sum, the State produced substantial evidence, which, as credited by the trial court, compelled a finding of guilt by accountability.  The trial court did credit the evidence, much of which was undisputed (the photographs of defendant's activities at the scene being the leading example).  There is no reason to believe that the court's factual findings would have been any different or more favorable to defendant had he put on no evidence.

¶ 51    Defendant is correct that Moreno's testimony did little to help his cause and also provided further inculpatory evidence.  The trial court did note Moreno's statement that he did not consider defendant to be a friend, inferring from it that the two men had a "business relationship" (the type of "business" being quite clear).  Moreno also made explicit that the Camry and the Carpentersville house had been provided by a named drug cartel and that Point was part of the common criminal venture. However, the State's evidence already proved the close association between Moreno and defendant for "business" purposes.  It also strongly implied that the Camry had been provided by people who wished to remain anonymous to law enforcement authorities.  And even absent evidence that a drug cartel had paid for the house in Carpentersville, defendant's residence there

with Moreno was more evidence of his association with the venture that culminated in Moreno's possession of $1.6 million worth of cocaine.

¶ 52   More fundamentally, Moreno's testimony, to the extent that it was inculpatory, merely provided some corroboration for a State case that was already strong and compelling.  It is not reasonably probable that, had trial counsel refrained from calling Moreno, the result of the trial would have been any different.  Therefore, defendant's claim of ineffective assistance fails, and the judgment must be affirmed.

¶ 53                                    III. CONCLUSION

¶ 54   For the reasons stated, we affirm the judgment of the circuit court of Winnebago County.

¶ 55   Affirmed.