**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2023 IL App (3d) 200310-U

Order filed March 28, 2023

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2023

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 21st Judicial Circuit, Kankakee County, Illinois. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | Appeal No. 3-20-0310 Circuit No. 18-CF-159 |
| | ) | |
| MAURICE C. LUMPKINS, | ) ) | The Honorable Clark E. Erickson, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE PETERSON delivered the judgment of the court.
Justices Brennan and Hettel concurred in the judgment.

_____

**ORDER**

¶ 1    *Held*:    In an appeal in a criminal case in which defendant was convicted of multiple drug offenses, the appellate court found that: (1) the trial court did not err in denying defendant's motion to quash search warrant and suppress evidence; (2) defendant was proven guilty beyond a reasonable doubt of all of the drug offenses of which he was convicted, except for one; and (3) the trial court did not err in admitting into evidence at defendant's trial a statement made by a confidential source that was contained in a video recording of one of the controlled purchases of drugs that led, in part, to the issuance of the search warrant. The appellate court, therefore, affirmed the trial court's judgment in part and reversed the trial court's judgment in part.

¶ 2        After a bench trial, defendant, Maurice C. Lumpkins, was found guilty of three counts of

unlawful possession of a controlled substance with intent to deliver (counts I, II, and IV) (720

ILCS 570/401(a)(1)(A), (c)(1), (c)(2) (West 2018)) and one count of unlawful delivery of a

controlled substance (count V) (720 ILCS 570/401(d)(i) (West 2018)) and was sentenced to

concurrent prison terms of nine years on count I, five years on counts II and IV, and three years

on count V. Defendant appeals, arguing that: (1) the trial court erred in denying defendant's

motion to quash search warrant and suppress evidence (referred to hereinafter at times as the

motion to quash and suppress); (2) defendant was not proven guilty of the offenses beyond a

reasonable doubt; and (3) the trial court erred in admitting into evidence at defendant's trial a

statement made by a confidential source that was contained in a video recording of one of the

controlled purchases of drugs that led, in part, to the issuance of the search warrant. We disagree

with defendant's first and third arguments and agree with defendant's second argument but only

as to one of the drug offenses. We, therefore, affirm the trial court's judgment in part and reverse

the trial court's judgment in part.

¶ 3                                              I. BACKGROUND

¶ 4        On March 19, 2018, David Ahramovich, a police officer assigned to the Kankakee Area

Metropolitan Enforcement Group (KAMEG), an agency that focused upon violations of the

Illinois drug laws, among other things, obtained a search warrant for the property located at 3593

South Main Street, Pembroke Township, Kankakee County, Illinois. The property at that address

had three structures on it: a white, one-story, single-family home (main residence); a white

mobile home with brown trim (mobile home); and a white camping trailer (camper). There were

two separate parcel identification numbers (PINs) for the property. One of the PINs ended in

008, and the other PIN ended in 009. The two parcels "[had] separate owners on record [with]

different tax billing addresses[ ] and no identifiable personal association." The main residence and the mobile home were located on the 008 parcel, and the camper was located on the 009 parcel. Defendant lived in the main residence. The search warrant authorized the search of the main residence, the mobile home, the camper, the curtilage of the property, and any vehicles located on the property for evidence of unlawful possession of a controlled substance with intent to deliver and specifically identified the items to be seized.[1]

¶ 5        Prior to obtaining the search warrant, Ahramovich had conducted two controlled purchases of drugs from the property using a confidential source. The first purchase took place on March 2, 2018, and the second purchase took place on March 9, 2018. Both purchases were recorded on a hidden video camera that was worn by the confidential source. Prior to and after each purchase, Ahramovich searched the confidential source and the source's vehicle and confirmed that the source did not have contraband or currency on his person or in his vehicle. During the first purchase, the confidential source drove to the property, parked his vehicle, and walked up to defendant, who was standing outside in the driveway area of the main residence next to a Chevrolet Trailblazer sport utility vehicle (SUV), along with Jermalde Gaines and Penny Day.[2] The source requested to purchase an amount of heroin, and defendant directed the source to speak to Gaines. Gaines had the source drive Gaines to a location adjacent to the property. At that location, the source gave Gaines $60 of prerecorded funds and asked Gaines to

_____

[1] The information about the search warrant provided here has been taken from the search warrant affidavit and complaint since it does not appear that the actual search warrant was made part of the record on appeal. The search warrant in the record is from a second search of the property that was subsequently conducted. The second search warrant had the affidavit and complaint for the first search warrant attached to it, along with the affidavit and complaint for the second search warrant.

[2] At defendant's bench trial, evidence was presented that suggested that the person the police thought was Penny Day was actually Gaines's wife, Toni Gaines. It does not appear from the record, however, that the matter was ever resolved with complete certainty.

3

provide him with a "rig" (a hypodermic syringe) in addition to the drugs. While the source remained in his vehicle, Gaines went inside both the mobile home and the camper. Gaines returned to the source's vehicle a short time later and gave the source a quantity of heroin in a clear plastic bag and a syringe. The source left the premises and turned the heroin and syringe over to Ahramovich.

¶ 6        During the second purchase, the confidential source drove to the property, got out of his car, and walked up to the main residence. There was no one outside so the source knocked on the door. A female subject answered the door. In response to the source's question as to whether any of the "guys" were there, the female subject directed the source to the camper "next door." The source drove over to where the camper was located and knocked on the door. Day answered the door. The source requested to purchase $75 worth of heroin. Day invited the source into the camper. Once the source was inside, Day removed a quantity of heroin from her bra, packaged the heroin in a clear plastic wrapper, weighed the heroin, showed the weight to the source, and then exchanged the heroin with the source for $75 of prerecorded funds. The source left the premises and turned the heroin over to Ahramovich.

¶ 7        In addition to describing the two controlled purchases, in the search warrant affidavit and complaint (referred to hereinafter as the search warrant affidavit), Ahramovich stated that in February 2016, he had taken part in executing a search warrant on the property. Defendant and other individuals were present in the main residence at that time. The main residence was searched, and a quantity of cocaine and heroin were found in defendant's bedroom, along with a loaded handgun, a digital scale, and over $900 (in the bedroom and on defendant's person). Defendant waived his *Miranda* rights and admitted that the cocaine was his and that he had been

selling drugs from the residence. Defendant stated further to the police that he was holding the heroin for someone else and that the gun belonged to a friend.

¶ 8        Ahramovich also described in the search warrant affidavit his training and experience as a police officer. Ahramovich stated in the affidavit that based upon his past investigations and through conversations with other officers, he had found that persons in possession of narcotics and the proceeds of an illicit business would often secrete their goods, proceeds, and records in a secure location where confederates and customers were denied access, including inside their private residences. Based upon his training and experience and his conversations with other officers, Ahramovich knew that persons involved with the delivery or sale of illicit drugs often hid and stored their illicit drugs in various locations on their property in an attempt to avoid seizure, including in the vehicles parked on the curtilage of their property. Based upon the observations of agents as described in the search warrant affidavit, Ahramovich believed that the two parcels (008 and 009) were being utilized as a single property with multiple individuals working together to conduct the sale and distribution of controlled substances. Ahramovich also believed that there was more heroin located on the curtilage of the property and in the structures to be searched.

¶ 9        On March 21, 2018, Ahramovich and several other KAMEG officers executed the search warrant at the property. During the search, quantities of drugs were recovered from defendant's person and from some of the vehicles on the property. Defendant was arrested and subsequently charged with six drug offenses. Four of the offenses (counts I, II, III, and IV) were based upon drugs that were recovered during the execution of the search warrant. The two remaining offenses (counts V and VI) were based upon the drugs that had been sold to the confidential

source earlier in the month when defendant was present at the property (the first controlled purchase).

¶ 10        In October 2019, defendant filed a motion to quash the search warrant that had been issued and to suppress the evidence that had been recovered. In the motion, defendant asserted, although somewhat ambiguously, that the evidence recovered from the property during the March 2018 search should be suppressed because probable cause was lacking for the issuance of the search warrant. The State filed a response and opposed the motion to quash and suppress, claiming, in part, that the motion failed to allege any grounds that would justify suppressing the evidence that was recovered.

¶ 11        In December 2019, a hearing was held on the motion to quash and suppress. Defendant was present in court for the hearing and was represented by his attorney. At the outset of the hearing, defense counsel called defendant to testify. As defense counsel was finishing his direct examination of defendant, the trial court expressed some confusion as to what defense counsel was trying to establish with regard to the search warrant (what defense counsel was claiming was wrong with the search warrant). After some discussion between the trial court, the prosecutor, and defense counsel, the trial court, without ruling upon the motion to quash and suppress, gave defense counsel leave to file an amended motion (presumably, to add a claim that false information had been presented by the police in obtaining the search warrant). Defense counsel, however, never filed an amended motion.

¶ 12        Over four days in June 2020, a bench trial was held in defendant's case. Defendant was present in court for the trial and was represented by his attorney. Prior to the start of the trial, two of the six offenses (counts III and VI) of which defendant had been charged were dismissed on motion of the State.

¶ 13     During its case-in-chief, the State presented the testimony of Ahramovich, two of the other KAMEG officers that had taken part in the execution of the search warrant on the property, and two forensic chemists who had tested the controlled substances that had been obtained/recovered during the first controlled purchase and the execution of the search warrant. The State also admitted into evidence numerous exhibits, including the controlled substances and other items that were obtained/recovered during the first controlled purchase and the execution of the search warrant, the video recording of the first controlled purchase, a copy of the search warrant, the video recording of defendant's statement to police that was taken after defendant was arrested in the instant case, and numerous photographs that were taken when the current search warrant was executed.

¶ 14     The testimony and exhibits admitted by the State at the bench trial established the following information. With regard to the March 2, 2018, controlled purchase, the evidence showed that the purchase had generally taken place in the manner that it was described by Ahramovich in the search warrant affidavit as set forth above. After the purchase was completed, the chunky substance that was recovered from the confidential source was submitted to the lab where it was found to contain heroin and to have a weight of 0.201 grams.

¶ 15     As for the video recording of the first controlled purchase, Ahramovich testified during the bench trial that prior to the controlled purchase, he confirmed that the hidden camera was working properly by filming a short section of video, which Ahramovich referred to as a "header." During the header video, Ahramovich announced the correct date and time because the date and time stamp produced by the video camera itself was incorrect and listed the year as 1970. The video camera did not have any buttons on it that would allow the user to edit the video from the camera. In addition, the police officers did not have any equipment that would allow

7

them to see what was happening through the video camera as it was recording. Following the controlled purchase, after the video camera was secured from the confidential source, Ahramovich took the camera to the police station and downloaded the video from the camera to the police server. The original video on the camera was then deleted due to memory constraints on the camera. In court at the bench trial, Ahramovich testified that the video presented by the State was a true and accurate reflection of what was recorded by the police's equipment (the hidden camera) on the date of the first controlled purchase.

¶ 16    During the bench trial, defendant objected to various portions of Ahramovich's testimony about the video recording. The State responded that the testimony was proper under the silent witness doctrine. In a discussion about the matter, the trial court pointed out that some of the objections that defendant was raising were the same objections that defendant had previously raised in the motion to quash and suppress or in the hearing on the motion. After conferring with the clerk and the attorneys, the trial court realized that it might not have ruled upon the motion or, at the very least, that the record was unclear as to whether the trial court had ruled upon the motion. The trial court stated, therefore, "Your motion—your objection is denied, Mr. [Defense Counsel]."

¶ 17    Following the playing of a portion of the video recording for the trial court, the State asked Ahramovich some questions about what was shown on that portion of the video recording. Ahramovich testified as to which person in the video recording was defendant and which person was Gaines. Ahramovich also identified in the video recording two of the vehicles, the Trailblazer (referenced previously) and a Chevrolet Monte Carlo, that were parked on the property. According to Ahramovich, the person who could be heard talking with a higher-pitched voice on the video recording was the confidential source. Ahramovich stated further in his

8

testimony (on redirect examination) that in the video recording, the source initially approached defendant and stated something and that defendant then pointed toward Gaines and told the source to "follow him." During another portion of the video, Ahramovich identified Gaines as the person who had entered the confidential source's vehicle. Ahramovich testified that when the confidential source requested a "rig" from Gaines on the video recording, the source was referring to a hypodermic syringe. When asked on the witness stand about the current whereabouts of the confidential source, Ahramovich stated that he was no longer in contact with the confidential source, who was from Indiana, and that he was unable to secure the source's presence for defendant's bench trial.

¶ 18    As for the execution of the search warrant, the State's evidence established that on March 21, 2018, Ahramovich and several other KAMEG officers went to the property for that purpose. The property was located in a vast rural wooded area and contained a shared driveway with the neighboring residence, which had no connection to the instant case. To the right of the driveway was the target property. As indicated above, the target property contained three structures—the main residence, the mobile home, and the camper—and appeared, at least to the officer who recovered all of the evidence during the execution of the search warrant, to be one property (one parcel of real property). The mobile home was located behind the main residence, and the camper was located to the right of the main residence.

¶ 19    As the officers were arriving at the property that day (Ahramovich was in a KAMEG squad car), defendant was attempting to pull out of the driveway in the Trailblazer and another vehicle, a large black Chevrolet Tahoe driven by Gaines, was driving through the yard. The police officers stopped the two vehicles, detained or arrested defendant and Gaines, and searched

9

the property and the vehicles pursuant to the search warrant. Defendant's person was also searched incident to arrest.

¶ 20　　　Upon searching defendant's person, the police officers found in defendant's pocket a cell phone, three packets of Suboxone (an opioid inhibitor that was usually prescribed to heroin addicts), $824, and two bags of an off-white, rock-like substance. In the first bag there was no additional packaging. In the second bag, however, the substance had been divided up into 19 individually-packaged smaller baggies. Both bags were later sent to the state police crime lab (lab) for testing. The lab found that the first bag contained cocaine with a weight of 2.3 grams. The lab individually tested 7 of the 19 baggies contained within the second bag and found that the baggies contained cocaine with a combined total weight of 1.3 grams.

¶ 21　　　In addition to the items found on defendant's person, numerous items were also found in the vehicles on the property. In the back of the Trailblazer that defendant had been driving, the police officers found, sitting out in the open, a clear plastic sandwich bag containing 23 individually-packaged baggies of an off-white substance. The bag was later submitted to the lab for testing. The lab individually tested 7 of the 23 baggies and found that the baggies contained heroin with a combined total weight of 3.1 grams. The police officers also found in the Trailblazer a box of clear plastic sandwich bags and a digital scale in the back pocket of the front passenger seat. Nothing of value was found in the Tahoe that Gaines had been driving. In the Monte Carlo, which was still parked in the same place on the property where it had been seen during the first controlled purchase, police officers found a bag containing four baggies of an off-white substance. The bag had been shoved way back into the back of the vehicle's glove compartment. The bag was later submitted to the lab for testing. The lab individually tested two

of the four baggies and found that the baggies contained heroin with a combined total weight of 20.3 grams.

¶ 22    As for the three structures (the main residence, the mobile home, and the camper) on the property, when the officers searched the main residence, they noticed that it had surveillance cameras outside on every corner. The surveillance cameras fed into a digital video recorder (DVR) that was located in the living room and were actively feeding live video to the DVR when the officers entered the main residence. In addition to the DVR, inside the living room, the police officers also found a loaded handgun, a wallet, and an identification card on the windowsill. The identification card was for defendant. Additional ammunition of different calibers was found in the kitchen of the home. In a bedroom or bedrooms in the home, the police officers found men's clothing and a letter from the Internal Revenue Service (IRS) addressed to defendant at the address of the property.[3] Outside, on the side of the main residence, the police officers found a used syringe lying on the concrete. With regard to the mobile home, it does not appear from the record that anything of evidentiary value was found when the search warrant was executed. Finally, as for the camper, upon conducting their search, the police officers found a bag containing numerous items of garbage and syringes.

¶ 23    Following his arrest on the date that the search warrant was executed, defendant waived his *Miranda* rights and gave a brief video-recorded statement to the police. Defendant told the police that the white house (the main residence) was his residence and that the address of the house was 3593 South Main Street. According to defendant, when the officers arrived that day, defendant was leaving the property in the Trailblazer to follow a person in a white truck. The

---

[3] It is unclear from the record whether the men's clothing and the IRS letter were found in the same bedroom.

person in the white truck had recently purchased the Trailblazer and had asked defendant to help him take the Trailblazer to the shop. The person in the white truck had just left the property as the police were arriving that day. During his video-recorded statement, defendant denied that he knew anything about the heroin in the Trailblazer or in the Monte Carlo. Defendant stated that the Monte Carlo belonged to a "buddy" of his. Defendant also stated that the person who owned the Monte Carlo was "his cousin" and gestured toward the wall. There is no indication, however, who defendant was referring to at that time or toward whom defendant was gesturing. Defendant stated further in his statement to the police that the crack cocaine that was found in his pocket was defendant's and that it was for his own personal use. When asked about the gun that was found in the main residence, defendant told the police that the gun belonged to his "granny," and that he never got rid of the gun after his "granny" had died. Defendant acknowledged that he had moved the gun at one point when he was cleaning his "granny's" room. When the police asked defendant if he sold heroin or crack cocaine, defendant responded that he did not and that no one could say that he had sold them anything or that he had put anything into their hand.

¶ 24        After the State rested its case-in-chief, defendant testified on his own behalf. Defendant stated that he had lived at the current address, 3593 South Main Street, since about 2014. Defendant stayed at that address with his fiancée. The property was owned by Callie Jones and William Frazier (who was defendant's fiancée's father). Frazier would stay at times in the main residence and would also stay in the mobile home on the property. Gaines lived next door to defendant in the camper on lot 9. Defendant thought that the address for the camper property was 3610 South Main Street. The lot that the camper was on was owned by Gaines's friends. Gaines would come over at times and chat with defendant, since defendant and Gaines were neighbors.

12

¶ 25    On the date of the first controlled purchase (March 2, 2018), defendant was present at his residence, along with Gaines; Gaines's wife, Toni Gaines; and two other people. Toni was the person that the police were incorrectly referring to as Penny Day. Day had not been at the property since 2016. While Gaines was at defendant's property, a person (the confidential source) drove up in a vehicle. Defendant, Gaines, and Toni were standing outside defendant's residence at that time by one of the vehicles that were parked on the property. As the person walked up to defendant, defendant thought that Gaines had called the person over to Gaines. Defendant denied that he had told the person to go over to Gaines. Rather, according to defendant, he was giving the person a weird look because he did not recognize the person and did not know why the person was walking up to him. Gaines and the person left the premises and drove over to Gaines's property. Defendant did not know what happened after that point between Gaines and the other person and was not involved in any of that. According to defendant, a drug transaction did not take place at defendant's residence or property that day, and defendant was not engaged in a drug transaction.

¶ 26    As defendant's testimony continued, defendant stated that on March 21, 2018 (the date that the search warrant was executed), at around 1 p.m., KAMEG officers raided defendant's property. Prior to the officers' arrival, defendant and Gaines were standing outside. As Gaines walked off, defendant saw the police vehicles approaching. The Trailblazer and the Monte Carlo were both present on defendant's property that day, and defendant was standing next to the Trailblazer.

¶ 27    As the police officers approached, one of the officers, Officer English, jumped out of the police vehicle and ordered defendant to put his hands in the air. Defendant did so. English grabbed defendant's arm and put it behind defendant's back. Defendant was high and shook up

13

when that occurred and could not recall on the witness stand if he was getting ready to drive the Trailblazer or if he was just standing there.[4] The police officers put defendant in handcuffs. Defendant asked to see the search warrant or the probable cause for searching the property, but he was not allowed to see the search warrant at that time. English asked defendant if he had anything on his person, and defendant told English that he had a little bit of crack in his pocket for personal use. The police officers recovered the crack cocaine from defendant's person and took defendant to jail.

¶ 28    Defendant admitted on the witness stand that he did have cocaine in his pocket when the search warrant was executed. Defendant stated that he had purchased the cocaine from Gaines shortly before the raid occurred. Defendant knew that Gaines was a drug dealer and also knew, based upon the traffic going in and out of Gaines's yard, that Gaines sold heroin. Defendant did not know, however, whether Gaines's wife, Toni, sold drugs as well. Defendant had a crack cocaine problem, and Gaines was the person who sold crack cocaine to defendant. Defendant did not use heroin or have a heroin problem. Defendant had no idea as to Gaines's current whereabouts.

¶ 29    During his testimony, when defendant was asked more specifically about the Monte Carlo, he stated that he did not know anything about the vehicle and that the vehicle did not belong to anyone at defendant's residence (the main residence). According to defendant, Frazier and Gaines had something going on with the Monte Carlo, but defendant did not know what it was. Frazier had told Gaines that he could park the vehicle in that location on defendant's property where it would not be in the way. Gaines did not have room for the vehicle on his own

_____

[4] Defendant stated later in his testimony that the Tahoe had been sold so he was going to follow Gaines in the Trailblazer, apparently to deliver the Tahoe to whomever had bought it.

14

property with all of the traffic that he had to his property. There were four vehicles on defendant's property, and defendant did not own any of them.

¶ 30 As for some of the other items that were found on defendant's property during the execution of the search warrant, defendant stated that the cameras had been up on the outside of the main residence since the last police raid in 2016. The gun in the living room belonged to defendant's fiancée's grandmother, who had since passed away. Defendant had placed the gun on the fish tank in the living room behind the windowsill.

¶ 31 At the conclusion of the bench trial, after all of the evidence had been presented and the attorneys had made their closing arguments, the trial court found defendant guilty of counts I, II, IV, and V. In announcing its ruling, the trial court stated as follows:

> "I think it's very clear from the evidence that 3953 [*sic*] South Main in Pembroke was a location where there was significant drug dealing taking place.
>
> It—there was a drug dealing operation there. The cameras on every corner of the outside of the house. A loaded—this isn't just some gun that a relative has bequeathed or—or left. I mean, this is a loaded gun and—and chambered in the front window near a security monitor.
>
> This is a house that on March 2nd the CS goes to to buy drugs. And I do find it persuasive that virtually the only words spoken by the defendant when the CS arrived was—what was it, 'over there' or 'follow him'? I guess 'follow him.'
>
> And then—and then the evidence is that, from the video—which is admitted under the silent witness doctrine—the CS and Jermalde Gaines drove next door to the camper and that the—Jermalde Gaines then produced and gave to the CS a quantity of heroin and a syringe.

15

And there's syringes all over the place. There's a syringe outside the white house, Mr.—Mr. Lumpkins' house. There's a syringe outside. There's a bag of syringes in the house that Jermalde Gaines had gone to back on March the 2nd. The—there's a syringe that was given to the—given to the CS at the time of the purchase.

So when the—and then when the search warrant is executed, frankly, there are drugs everywhere.

The defendant, who is significantly impeached here because he told the police that he was driving the vehicle—he certainly said he was in the—you cannot misinterpret what he said.

At minimum, he was inside of a vehicle at the time that KAMEG arrived. Yet he testifies that, No, I was never inside the vehicle. That's not believable.

And the—in fact, and it's not believable that the defendant would be unaware that there are drugs everywhere on this property. Everywhere? Why do I say that? Well, there was cocaine in his pocket. You had two quantities. You had the—a single quantity in one bag. And then you had 19 packets. You said it's personal use. I don't believe that, not with the 19 packets.

In the vehicle that he was driving, he had bags and a digital scale in the back pocket of the front passenger seat. And then in the rear of that—of that vehicle, there is the—the bag of—the bag of heroin.

And this is the quantity of—oh, let's see. This is the—oh, that's the 23 bags or 3.1 grams of heroin. The cocaine consisted of 2.3 grams in one bag. And

then the 19 packets consisted of 1.3 grams. It certainly was—so the total was over 1 gram.

The—the heroin in the back of the vehicle that the defendant was driving when KAMEG arrived weighed—netted out at 3.1 grams and tested positive for heroin. And that consisted of 23 bags.

The 3.1 grams was the quantity that was measured random—from the random taking of seven—I guess it was seven bags—seven or eight bags that the analyst chose to analyze.

It's preposterous to try to shift the responsibility for these drugs being in the back of his vehicle at a time that he had cocaine in his pocket, Suboxone in his pocket, a digital scale, and bags in the rear passen- --in the front passenger seat, the back pocket.

It's preposterous to say that, Well, gee, the—the heroin came from the—the police planting it. That's not believable at all. There's no evidence of that.

And I think that the State's argument that what the defendant did was probably just tossed it into the back is the most likely explanation for somebody driving around in a SUV with a bag of heroin just openly in back.

But the—the issue here is not to explain exactly how that got there. What—what's obvious is that the defendant had to know it was there.

And I do believe that it's a reasonable inference that when he saw that he was being closed in by the KAMEG vehicles, that he simply tried to—tried to hide it in the back thinking that, you know, maybe—well, thinking that was probably the best thing he could do to try to avoid being caught with it.

So I don't think there's any—I don't think there's any question here as to the defendant's guilt. And I think that the State has proven the defendant guilty by proof beyond a reasonable doubt on the charges.

I do want to mention the—the Monte Carlo because there is a significant quantity of 20 grams of heroin in the glove compartment. And that does—that does take the possession with the intent of heroin from a Class 1 to a Class X when you add that 20 grams.

But I think it's—I think—I think it is a reasonable inference to be drawn from all of the evidence that the defendant had constructive possession, knowing possession of the heroin in the glove compartment of the Monte Carlo.

Again, it's clear that this was a—this was a location where drugs were being sold.

And, I mean, bags everywhere. Extra needles, you need those? Just go next door. There's a bag of needles. Need extra bags or scales? Just look in the back of the—just look in the vehicle the defendant's driving. Extra ammunition? You know, that's hiding in the kitchen.

It's clear that the defendant had not only constructive possession of the Monte Carlo in his driveway, which we know was there for a period of at least 20 days, but also knowledge that it contained a quantity of heroin for distribution."

¶ 32    Defendant filed a motion to vacate the convictions or for a new trial and challenged the issuance of the search warrant, the sufficiency of the evidence, and the admission of the video recording from the March 2, 2018, controlled purchase. The trial court subsequently denied the motion. Following a sentencing hearing, the trial court sentenced defendant to concurrent prison

18

terms of nine years on count I, five years on counts II and IV, and three years on count V. Defendant appealed.

¶ 33                                   II. ANALYSIS

¶ 34                    A. Motion to Quash Search Warrant and Suppress Evidence

¶ 35          As his first point of contention on appeal, defendant argues that the trial court erred in denying defendant's motion to quash the search warrant that had been issued in this case and to suppress the evidence that had been recovered. Defendant asserts that his motion to quash and suppress should have been granted because the search warrant affidavit failed to establish probable cause to search defendant's property (the 008 property). More specifically, defendant contends that probable cause was lacking as to his property because he was not the person who sold the drugs to the confidential source during the two controlled purchases referred to in the search warrant affidavit and because the two controlled purchases took place on a completely separate property (the 009 property) and not on defendant's property (the 008 property). Thus, defendant contends that there was no nexus between the drug transactions, defendant, and defendant's property. Defendant asserts further that the remaining information contained in the search warrant affidavit—the information about the 2016 search of defendant's property—was stale since the 2016 search took place more than two years prior to the search warrant application in the instant case and since there was no evidence that defendant was involved in a continuing course of criminal conduct. Rather, defendant maintains, the search warrant affidavit showed that his only involvement in the two controlled purchases was that he refused to speak to the confidential source when the source initially walked up on defendant's property during the first controlled purchase and that defendant directed the source to speak to Gaines at that time. For those reasons, defendant asks that we reverse the trial court's denial of defendant's motion to

19

quash and suppress. In addition, because the State would be unable to prove counts I, II, and IV without the suppressed evidence, defendant also asks that we reverse outright his convictions on counts I, II, and IV.

¶ 36    The State argues that the trial court's denial of defendant's motion to quash and suppress was proper and should be upheld. In support of that argument, the State contends first that defendant has forfeited his assertions on this issue because defendant failed to file an amended motion to quash and suppress, failed to request a probable cause determination, and failed to raise some of his assertions in either his motion to quash and suppress or in his posttrial motion. Second, and in the alternative, the State contends that even if defendant did not forfeit his assertions on this issue, the trial court's denial of defendant's motion to quash and suppress should still be upheld because the information contained in the search warrant affidavit was sufficient to establish probable cause to search defendant's property and was not stale. The State asks, therefore, that we affirm the trial court's denial of defendant's motion to quash and suppress and that we affirm defendant's convictions.

¶ 37    In reply to the State's claim of forfeiture, defendant asserts that he properly preserved this issue by arguing in his motion to quash and suppress in the trial court that probable cause was lacking for the issuance of a search warrant for defendant's property and by also raising the search warrant issue in his posttrial motion. In the alternative, defendant asserts that even if he failed to properly preserve this issue for appellate review, this court should still reach the merits of this issue, nevertheless, as a matter of first prong plain error because the evidence in this case was closely balanced. For those reasons and for the reasons initially stated, defendant again asks that we reverse the trial court's denial of defendant's motion to quash and suppress and that we reverse outright defendant's convictions on counts I, II, and IV.

20

¶ 38    A reviewing court applies a two-part standard of review to a trial court's ruling on a motion to quash a search warrant and suppress evidence. See *People v. Manzo*, 2018 IL 122761, ¶ 25; *People v. Padilla*, 2021 IL App (1st) 171632, ¶ 70. The trial court's findings of fact are given great deference and will not be reversed on appeal unless they are against the manifest weight of the evidence. See *Manzo*, 2018 IL 122761, ¶ 25; *Padilla*, 2021 IL App (1st) 171632, ¶ 70. However, as to the trial court's ultimate decision granting or denying the motion, *de novo* review applies. See *Manzo*, 2018 IL 122761, ¶ 25; *Padilla*, 2021 IL App (1st) 171632, ¶ 70; but see *Illinois v. Gates*, 462 U.S. 213, 236 (1983) (indicating that an issuing judge's determination of probable cause for a search warrant should be paid great deference by the reviewing court and should not be reviewed *de novo* on appeal). In reviewing the issuance of a search warrant, a reviewing court may not substitute its judgment for that of the issuing judge but must decide whether the issuing judge had a substantial basis for concluding that probable cause existed. *Manzo*, 2018 IL 122761, ¶ 31; *Padilla*, 2021 IL App (1st) 171632, ¶¶ 70-71, 89.

¶ 39    The fourth amendment to the United States Constitution guarantees the right of the people to be free from unreasonable searches and seizures. See U.S. Const., amend. IV; *Manzo*, 2018 IL 122761, ¶ 26; see also *Elkins v. United States*, 364 U.S. 206, 213 (1960) (indicating that the fourth amendment prohibition against unreasonable searches and seizures is applicable to state officers through the fourteenth amendment). As part of that protection, the fourth amendment provides that no warrant shall issue except upon probable cause. See U.S. Const., amend. IV; *Manzo*, 2018 IL 122761, ¶ 26. Article I, section 6, of the Illinois Constitution provides similar protection. See Ill. Const. 1970, art. I, § 6; *Manzo*, 2018 IL 122761, ¶ 27. Illinois courts interpret the search and seizure clause of the Illinois Constitution in limited lockstep with that of the federal constitution. See *Manzo*, 2018 IL 122761, ¶ 27. Thus, under

21

both the federal and state constitutions, a search warrant must be supported by probable cause to be valid. See U.S. Const., amend. IV; Ill. Const. 1970, art. I, § 6; *Manzo*, 2018 IL 122761, ¶ 28.

¶ 40   The test for probable cause for a search warrant is a totality of the circumstances test. See *Manzo*, 2018 IL 122761, ¶ 29; *Padilla*, 2021 IL App (1st) 171632, ¶¶ 69, 71. Pursuant to that test, probable cause for a search warrant exists if the totality of facts and circumstances known to the affiant at the time the search warrant is sought is sufficient to warrant a person of reasonable caution to believe that the law was violated and that evidence of that violation is on the premises to be searched. *Manzo*, 2018 IL 122761, ¶ 29; *Padilla*, 2021 IL App (1st) 171632, ¶¶ 69, 71; *People v. Beck*, 306 Ill. App. 3d 172, 177-78 (1999). In other words, for probable cause for a search warrant to be present, there must be a sufficient nexus or connection between a criminal offense, the place to be searched, and the items to be seized. See *Manzo*, 2018 IL 122761, ¶ 35; *Beck*, 306 Ill. App. 3d at 178-79; *People v. McCoy*, 135 Ill. App. 3d 1059, 1066 (1985). The proof of that connection may be established by direct information or by reasonable inferences. See *Beck*, 306 Ill. App. 3d at 179; *McCoy*, 135 Ill. App. 3d at 1066. It is the probability of criminal activity, rather than proof beyond a reasonable doubt, that is the standard for determining whether probable cause exists for the issuance of a search warrant. *Manzo*, 2018 IL 122761, ¶ 29; *Beck*, 306 Ill. App. 3d at 178. The determination of probable cause must be made on a case-by-case basis and is governed by factual and practical commonsense considerations, not by technical legal rules. *Manzo*, 2018 IL 122761, ¶ 30; *Padilla*, 2021 IL App (1st) 171632, ¶¶ 69-70, 89; *Beck*, 306 Ill. App. 3d at 178. The sufficiency of a search warrant affidavit rests upon whether, when the affidavit is considered as a whole, it adequately establishes a fair probability that evidence of a crime would be found in a particular place. *Beck*, 306 Ill. App. 3d at 178.

22

¶ 41    In some instances, the facts alleged in a search warrant affidavit may have occurred too long ago to provide probable cause for the issuance of a search warrant. See *id.* at 179. There is no set cutoff period, however, for when the facts alleged will become stale and when probable cause will cease to exist. *McCoy*, 135 Ill. App. 3d at 1067; *People v. Donath*, 357 Ill. App. 3d 57, 64 (2005). Rather, the absence of a rigid cutoff period allows the issuing judge to exercise his or her informed judgment as to the matter. *Donath*, 357 Ill. App. 3d at 64. Although the decision must be made based upon the unique circumstances of each case, the single most important factor in determining whether the information contained in a search warrant affidavit is valid or stale is whether the defendant was engaged in a continuing course of criminal conduct. See *Beck*, 306 Ill. App. 3d at 179; *McCoy*, 135 Ill. App. 3d at 1067.

¶ 42    Ultimately, the question of whether probable cause exists to justify the issuance of a search warrant must be resolved by a detached judicial officer based upon the above-described totality of the circumstances test. See *Manzo*, 2018 IL 122761, ¶ 29; *Padilla*, 2021 IL App (1st) 171632, ¶ 71. Hearsay information may be considered as long as a substantial basis is presented for crediting the hearsay information. See *Padilla*, 2021 IL App (1st) 171632, ¶ 69. Doubtful or marginal cases should largely be determined by the preference to be accorded to search warrants. See *Manzo*, 2018 IL 122761, ¶ 31; *Padilla*, 2021 IL App (1st) 171632, ¶ 71. If a search warrant affidavit provides a substantial basis for the issuing judge's probable cause finding, a reviewing court will affirm the trial court's denial of a defendant's motion to quash and suppress. See *Manzo*, 2018 IL 122761, ¶ 31; *Padilla*, 2021 IL App (1st) 171632, ¶ 71.

¶ 43    In the present case, after reviewing the record of the trial court proceedings, we find that defendant properly preserved the search warrant issue for appellate review and did not forfeit that issue. See *People v. Enoch*, 122 Ill. 2d 176, 186 (1988) (noting that to preserve an error for

23

appellate review, a defendant must object to the error at trial and include the error in a written posttrial motion); *People v. Allen*, 222 Ill. 2d 340, 350 (2006) (same). Defendant raised the issue of probable cause in his motion to quash and suppress, albeit somewhat ambiguously, and also raised the issue in his posttrial motion to vacate the convictions or to obtain a new trial.

¶ 44    Turning to the merits of defendant's claim, upon reviewing the search warrant affidavit in this case, we find that the search warrant was supported by probable cause to believe that evidence of unlawful possession of a controlled substance with intent to deliver would be found on defendant's property. In the search warrant affidavit, Officer Ahramovich described the circumstances of the two controlled purchases of heroin that had recently been made and had originated at defendant's property. Defendant had been present for the start of the first controlled purchase and had directed the confidential source to meet with Gaines almost immediately after the source had walked up on the property. In addition, during the first purchase, Gaines was seen by the confidential source going into both the mobile home on defendant's property and the camper on Gaines's property just prior to making the sale to the source, a fact that defendant ignores here. Along with a description of the two controlled purchases, Ahramovich also provided in the search warrant affidavit a description of his training and experience as a police officer and stated that he knew from that training and experience and his conversations with other police officers that people who sold drugs tended to keep the drugs, currency, and records in secure locations, such as in their own residences or in vehicles parked on their properties. Furthermore, Ahramovich presented in the search warrant affidavit his knowledge of the execution of the 2016 search warrant where drugs, money, and a gun were found in the main residence and where defendant had admitted that he had been selling drugs out of the residence. That information was not stale when considered along with the two recent controlled purchases,

24

which arguably showed that drug sales involving defendant were still taking place on the property as part of a continuing course of criminal conduct. See *Beck*, 306 Ill. App. 3d at 179 (indicating that the most important factor in determining whether information contained in a search warrant affidavit is valid or stale is whether the defendant was involved in a continuing course of criminal conduct); *McCoy*, 135 Ill. App. 3d at 1067 (same). Although the circumstances of the property in this case were somewhat unusual in that the property was comprised of two parcels that had separate PINs and different owners of record, that information was accurately presented to the trial court in the search warrant affidavit so that the trial court could make its own determination of whether probable cause existed to support a search of the property. Based upon the totality of the facts and circumstances present in this case, we find that the instant search warrant affidavit provided the issuing judge with a substantial basis to conclude that probable cause existed for the issuance of a search warrant for defendant's property. See *Manzo*, 2018 IL 122761, ¶ 31; *Padilla*, 2021 IL App (1st) 171632, ¶¶ 70-71, 89. We therefore affirm the trial court's denial of defendant's motion to quash the search warrant and to suppress the evidence. See *Manzo*, 2018 IL 122761, ¶ 31; *Padilla*, 2021 IL App (1st) 171632, ¶¶ 70-71, 89.

¶ 45       In reaching that conclusion, we have reviewed and considered *People v. Rojas*, 2013 IL App (1st) 113780, the main case relied upon by defendant to support his argument on this issue, and have found that case to be distinguishable from the instant case. In the instant case, unlike in *Rojas*, there was both direct and inferential evidence set forth in the search warrant affidavit to establish that defendant was involved in criminal drug activity and that evidence of that activity could be found in defendant's residence and in the vehicles and other buildings on the property. Compare *id.* ¶¶ 18-20. Although the configuration of the property was unusual, Ahramovich

25

explained in the affidavit why he believed that the two parcels were being used as a single property with multiple individuals working together to conduct the sale and distribution of controlled substances and provided specific details in the affidavit to support his belief in that regard. Unlike the search warrant affidavit in *Rojas*, the search warrant affidavit in the present case provided ample information for the trial court to determine that probable cause existed to justify issuing a search warrant for defendant's property. Compare *id.*

¶ 46                        B. Proof Beyond a Reasonable Doubt

¶ 47        As his second point of contention on appeal, defendant argues that he was not proven guilty beyond a reasonable doubt of the four drug offenses. More specifically, defendant asserts that he was not proven guilty of counts I (the heroin recovered from the Monte Carlo) and II (the heroin recovered from the Trailblazer) because the State failed to establish that defendant had knowledge and possession of the controlled substances; that he was not proven guilty of count V (the heroin delivered to the confidential source during the first controlled purchase) because the State failed to establish that defendant was accountable for the actions of Gaines; and that he was only proven guilty of simple possession, and not possession with intent to deliver, in count IV (the cocaine found on defendant's person). Defendant asks, therefore, that we reverse outright his convictions on counts I, II, and V and that we reduce defendant's conviction on count IV to simple possession.

¶ 48        The State disagrees with defendant's assertions and argues that, when viewed in the light most favorable to the State, the evidence was sufficient to prove defendant guilty of all four drug offenses beyond a reasonable doubt. The State asks, therefore, that we affirm defendant's convictions.

26

¶ 49        Pursuant to the *Collins* standard (*People v. Collins*, 106 Ill. 2d 237, 261 (1985)), a reviewing court faced with a challenge to the sufficiency of the evidence must view the evidence in a light most favorable to the prosecution and determine whether any rational trier of fact could have found the elements of the crime proven beyond a reasonable doubt. *People v. Jackson*, 232 Ill. 2d 246, 280 (2009). In applying the *Collins* standard, the reviewing court will allow all reasonable inferences from the record in favor of the prosecution. *People v. Bush*, 214 Ill. 2d 318, 326 (2005). The reviewing court will not retry the defendant. *People v. Austin M.*, 2012 IL 111194, ¶ 107. Determinations of witness credibility, the weight to be given testimony, and the reasonable inferences to be drawn from the evidence are responsibilities of the trier of fact, not the reviewing court. *People v. Jimerson*, 127 Ill. 2d 12, 43 (1989). Thus, the *Collins* standard of review fully recognizes that it is the trier of fact's responsibility to fairly resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. See *Jackson*, 232 Ill. 2d at 281. That same standard of review is applied by the reviewing court regardless of whether the evidence is direct or circumstantial or whether defendant received a bench or a jury trial, and circumstantial evidence meeting that standard is sufficient to sustain a criminal conviction. *Id.*; *People v. Kotlarz*, 193 Ill. 2d 272, 298 (2000). When applying the *Collins* standard, a reviewing court will not reverse a defendant's conviction unless the evidence is so improbable, unsatisfactory, or inconclusive that it leaves a reasonable doubt of the defendant's guilt. *Austin M.*, 2012 IL 111194, ¶ 107.

¶ 50        In the instant cases, as indicated above, defendant challenges the sufficiency of the proof as to the elements of some of the offenses and as to defendant's accountability for the actions of Gaines. Starting with the elements of the offenses, we note that to sustain a charge of unlawful possession of a controlled substance with intent to deliver, the State must prove the following

27

three elements beyond a reasonable doubt: (1) that the defendant had knowledge of the presence of the controlled substance (the knowledge element); (2) that the controlled substance was in the immediate possession or control of the defendant (the possession element); and (3) that the defendant intended to deliver the controlled substance (the intent to deliver element). See 720 ILCS 570/401 (West 2018); *People v. Robinson*, 167 Ill. 2d 397, 407 (1995). The knowledge element of the offense may be established by evidence of acts, declarations, or conduct from which it may fairly be inferred that the defendant knew of the existence of the controlled substance in the place where it was found. See *People v. Bell*, 53 Ill. 2d 122, 126 (1972); *People v. McLaurin*, 331 Ill. App. 3d 498, 502 (2002).

¶ 51    The possession element may be proven by evidence that defendant was either in actual or constructive possession of a controlled substance. See *People v. Adams*, 242 Ill. App. 3d 830, 832 (1993). Although possession of a controlled substance must be exclusive, it may be joint between two or more people. See *People v. Brown*, 277 Ill. App. 3d 989, 997 (1996). To prove actual possession, the State must show that the defendant exercised physical dominion over the controlled substance, such as by having the substance on his person or by trying to conceal or dispose of the substance. *People v. Ray*, 232 Ill. App. 3d 459, 461 (1992). To establish constructive possession, on the other hand, the State must show that the defendant had control over the area (the premises or a vehicle, for example) where the controlled substance was found. See *Adams*, 242 Ill. App. 3d at 832; *Ray*, 232 Ill. App. 3d at 462-63; *People v. McNeely*, 99 Ill. App. 3d 1021, 1024-25 (1981). Proof of such control gives rise to an inference that the defendant had both knowledge and possession of the controlled substance. See *People v. Nettles*, 23 Ill. 2d 306, 308-09 (1961). That inference may be sufficient to sustain a criminal conviction, absent other facts and circumstances that might leave a reasonable doubt of the defendant's guilt in the

28

trier of fact's mind. See *id.* While evidence establishing constructive possession is often entirely circumstantial (*McLaurin*, 331 Ill. App. 3d at 502), a defendant's mere proximity to the controlled substance or presence upon the premises or in the vehicle where the controlled substance is found, with nothing more, is not sufficient to establish constructive possession (see *Adams*, 242 Ill. App. 3d at 832).

¶ 52    As for the intent to deliver element of the offense (that the defendant had the intent to deliver the particular controlled substance), the determination of whether the evidence presented at trial was sufficient to prove that element must be made on a case-by-case basis considering all of the relevant facts and circumstances involved. See *Robinson*, 167 Ill. 2d at 412-13. There are too many different types of controlled substances and too many different possible factual situations for a bright-line test to apply. See *id.* at 414. Because direct evidence of intent to deliver rarely exists, it must usually be proven by circumstantial evidence. *Id.* at 408. Some of the factors that Illinois courts have considered to be probative of intent to deliver include whether the quantity of the controlled substance in defendant's possession is too large to be viewed as being for personal consumption; the high purity of the controlled substance confiscated; the possession of weapons; the possession of large amounts of cash; the possession of police scanners; the possession of drug paraphernalia; and the manner in which the controlled substance is packaged. *Id.* Although the quantity of a controlled substance or the manner of packaging alone may be sufficient to prove the intent to deliver, when the amount of the substance or the manner of packaging is consistent with personal use, courts have required additional evidence of intent to deliver to support a conviction. See *id.* at 410-14.

¶ 53    Finally, with regard to the accountability aspect of this case, we are mindful that under Illinois law, a person is legally accountable for the conduct of another if "either before or during

the commission of an offense, and with the intent to promote or facilitate that commission, he or she solicits, aids, abets, agrees, or attempts to aid that other person in the planning or commission of the offense." 720 ILCS 5/5-2(c) (West 2018); see also *People v. Taylor*, 164 Ill. 2d 131, 140 (1995). A person's mere presence at the scene of a crime does not make that person accountable for the offense. *Taylor*, 164 Ill. 2d at 140. In addition, a person's presence at the scene and knowledge that a crime was being committed, without more, is also insufficient to establish accountability. *Id.* That stated, active participation has never been required for the imposition of criminal guilt under an accountability theory—one may aid and abet without actively participating in the overt act. *Id.* A defendant may be found to be accountable for acts performed by another person if the defendant shared the criminal intent of that other person (the principal) or if there was a common criminal purpose or plan. *Id.* at 140-41. Words of agreement are not required to establish a common criminal purpose. *Id.* at 141. Rather, a common purpose may be inferred from the facts and circumstances surrounding the commission of the unlawful conduct. *Id.* Proof that the defendant was present during the commission of the offense, that he maintained a close affiliation with his companions after the crime was committed, and that he failed to report the crime are all factors that the trier of fact may consider in determining whether the defendant is legally accountable for the crime. *Id.* The fact that the defendant fled from the scene of the crime may also be considered in determining whether a defendant may be held accountable for the acts of another. *Id.* Evidence that defendant voluntarily attached himself to a group bent on illegal acts with knowledge of the group's common purpose supports an inference that the defendant shared the common purpose and will sustain the defendant's conviction for an offense committed by another. *Id.*

¶ 54     In the present case, viewing the evidence in the light most favorable to the State, we find that the evidence was sufficient to prove defendant guilty of counts II (the heroin found in the Trailblazer), IV (the cocaine found on defendant's person), and V (the heroin delivered to the confidential source). In explaining the reasons for our conclusion in that regard, we will address only those elements of each offense that defendant has challenged in this appeal. As to count II, contrary to defendant's assertion on appeal, the evidence was sufficient to establish that defendant had constructive possession of the heroin found in the Trailblazer. See *Nettles*, 23 Ill. 2d at 308-09; *Adams*, 242 Ill. App. 3d at 832; *Ray*, 232 Ill. App. 3d at 462-63; *McNeely*, 99 Ill. App. 3d at 1024-25. The Trailblazer was present on defendant's property when the first controlled purchase took place and was again present on defendant's property nearly three weeks later when the search warrant was executed. Defendant was driving the Trailblazer and attempting to leave the property when the officers arrived to execute the search warrant, conduct that could arguably suggest that defendant was trying to evade the police. The heroin was found sitting out in the open in the back of the Trailblazer immediately after defendant was removed from the vehicle or shortly thereafter. Although defendant claims on appeal that the drugs were found in the trunk of the vehicle and there was some testimony to that effect at the trial, that description was inaccurate since the Trailblazer was an SUV and did not have a trunk. As the driver and sole occupant of the vehicle, defendant had control over the area where the heroin was found, regardless of whether defendant actually owned the vehicle. See *McNeely*, 99 Ill. App. 3d 1024-25. In addition, the trial court, as the trier of fact, agreed with the State's theory that defendant had likely tossed the heroin to the back of the vehicle when he realized that he was going to be stopped by the police. Furthermore, defendant provided false information, either in his statement to the police or in his testimony at the bench trial, or both, and the trial court's

31

comments in its ruling at the bench trial indicate that the court found defendant's testimony not to be credible. Taking together all of the evidence that was presented in this case of defendant's knowledge and possession of the heroin found in the Trailblazer and considering that evidence in the light most favorable to the State, we conclude that the evidence was sufficient to prove defendant guilty beyond a reasonable doubt of possession of heroin with intent to deliver as alleged in count II of the charging instrument. See *Collins*, 106 Ill. 2d at 261; *Jackson*, 232 Ill. 2d at 280; *Nettles*, 23 Ill. 2d at 308-09; *Adams*, 242 Ill. App. 3d at 832; *Ray*, 232 Ill. App. 3d at 462-63; *McNeely*, 99 Ill. App. 3d at 1024-25; *People v. Peete*, 318 Ill. App. 3d 961, 966 (2001) (indicating that evidence of flight may be considered by the trier of fact as tending to show the defendant's consciousness of guilt). The evidence of defendant's knowledge and possession of the heroin in the Trailblazer was not so improbable, unsatisfactory, or inconclusive that it left a reasonable doubt of the defendant's guilt. See *Austin M.*, 2012 IL 111194, ¶ 107. We, therefore, affirm defendant's conviction on count II.

¶ 55 　　　　With regard to count IV (the cocaine found on defendant's person), despite defendant's claim to the contrary, we find that the evidence was sufficient to prove that defendant possessed the substance with the intent to deliver. See *Robinson*, 167 Ill. 2d at 408-14. As the trial court aptly found, the evidence in this case showed that the property (defendant's house, the mobile home, and the camper) was being used to conduct a drug-sales business. Cocaine was found on defendant's person, and heroin was found in the Trailblazer that defendant had been driving. Both sets of drugs were packaged in a manner that was indicative of drug sales, rather than personal use, and there was more than one type of drug involved. In addition to the manner in which the substances were packaged and the multiple types of drugs found, other indications of intent to deliver were also present. See *id.* A loaded gun was found in the living room of

32

defendant's residence and ammunition was found in the kitchen. Video cameras (a surveillance system) were found mounted on the outside corners of defendant's residence. The cameras fed live video into a DVR that was also located in defendant's living room and that was actively working at the time the search warrant was executed. A box of sandwich bags and a digital scale were found in the Trailblazer that defendant had been driving, along with the heroin that was recovered from that vehicle. A large amount of cash was found on defendant's person, and syringes were found in various locations on the property. Furthermore, as noted above, defendant provided false information in his statement to the police or in his trial testimony, or both, and the trial court at the bench trial found defendant's testimony not to be credible. Taking together all of the evidence of intent to deliver that was presented in this case and considering that evidence in the light most favorable to the State, we find that the evidence was sufficient to prove defendant guilty beyond a reasonable doubt of unlawful possession of cocaine with intent to deliver as alleged in count IV of the charging instrument. See *Collins*, 106 Ill. 2d at 261; *Jackson*, 232 Ill. 2d at 280; *Robinson*, 167 Ill. 2d at 408-14. The evidence of the defendant's intent to deliver the cocaine found on his person was not so improbable, unsatisfactory, or inconclusive that it left a reasonable doubt of the defendant's guilt. See *Austin M.*, 2012 IL 111194, ¶ 107. We, therefore, affirm defendant's conviction on count IV.

¶ 56       As for count V (the heroin delivered to the controlled source during the first controlled purchase), contrary to defendant's assertion on appeal, we find that the evidence was sufficient to establish that defendant was accountable for the acts committed by Gaines during the first controlled purchase. See *Taylor*, 164 Ill. 2d at 140-41. The evidence presented in the bench trial in this case showed that the confidential source had entered upon defendant's property to purchase heroin; that almost immediately after the confidential source had walked up to

33

defendant, defendant had directed the confidential source to follow Gaines; that defendant maintained close proximity with Gaines after the first controlled purchase had occurred and was apparently with Gaines on the property when the search warrant was executed; that defendant did not report the crime (the delivery of heroin) or any suspicious activity to the police; and that defendant arguably was attempting to flee from the residence in the Trailblazer and evade the police when the police were arriving to the property to execute the search warrant. In addition, defendant provided false information to the police or to the court, or both, and was found by the trial court not to be credible. Taking all of the evidence of accountability together in this case and considering that evidence in the light most favorable to the State, we find that the evidence was sufficient to prove defendant guilty beyond a reasonable doubt of unlawful delivery of heroin as alleged in count V of the charging instrument. See *Collins*, 106 Ill. 2d at 261; *Jackson*, 232 Ill. 2d at 280; *Taylor*, 164 Ill. 2d at 140-41. The evidence of defendant's accountability for the delivery of the heroin to the confidential source was not so improbable, unsatisfactory, or inconclusive that it left a reasonable doubt of the defendant's guilt. See *Austin M.*, 2012 IL 111194, ¶ 107. We, therefore, affirm defendant's conviction on count V.

¶ 57    Finally, with regard to count I (the heroin found in the Monte Carlo), the State's assertions to the contrary notwithstanding, we find that the evidence was insufficient to prove that defendant had knowledge or possession of the heroin found in the Monte Carlo located on defendant's property beyond a reasonable doubt. See *Adams*, 242 Ill. App. 3d at 832 (indicating that a defendant's mere proximity to the controlled substance or presence upon the premises or in the vehicle where a controlled substance is found, with nothing more, is not sufficient to establish constructive possession). The evidence presented at the bench trial in this case established that defendant was not the owner of the vehicle, that defendant had not been seen

34

driving the vehicle, and that defendant had not been seen in or around the vehicle. No evidence was presented to suggest that defendant had the keys to the vehicle or that the keys were located in the defendant's house. The heroin was found shoved in the back of the glove compartment of the vehicle, and no evidence, such as DNA, fingerprints, or items belonging to defendant, was presented to link defendant to the vehicle, the glove compartment, or the drugs. In our view, the evidence that the Monte Carlo was located on defendant's property, with nothing more, was not sufficient to establish that defendant had control over the Monte Carlo as necessary to prove a theory of constructive possession, even when that evidence is viewed in the light most favorable to the State and considered along with defendant's lack of credibility. See *Adams*, 242 Ill. App. 3d at 832; *People v. Horn*, 2021 IL App (2d) 190190, ¶¶ 44-52 (finding, albeit for the purposes of a probable cause determination, that the evidence presented was insufficient to establish that the defendant had constructive possession of cocaine found in an urn in the locked trunk of a vehicle that the defendant had been riding in as a passenger where there was no evidence that the defendant had regular, ongoing control of the vehicle or had a connection to the contents of the vehicle, none of the defendant's property was located in the vehicle, the vehicle was not registered to the defendant, the defendant was not driving the vehicle at the time of the traffic stop, and the available evidence pointed more directly to the driver as the guilty party); *People v. Drake*, 288 Ill. App. 3d 963, 964 (1997) (concluding in the context of a probable cause determination that the evidence presented was insufficient to establish that the defendant had constructive possession of cannabis and a gun that were found in a backpack located in the locked trunk of a vehicle that the defendant had been riding in as a passenger where there was no evidence presented that: the defendant had any degree of dominion or control over the trunk of the vehicle or over the contraband itself, that the defendant knew what was in the backpack, or

35

that the defendant had key to the vehicle or the vehicle's trunk). We conclude, therefore, that the evidence presented in this case failed to prove defendant guilty beyond a reasonable doubt of unlawful possession of heroin with intent to deliver as alleged in count I of the charging instrument. We, therefore, reverse defendant's conviction on count I.

¶ 58                    C. Admission of the Confidential Source's Statement

¶ 59        As his third and final point of contention on appeal, defendant argues that the trial court erred in admitting into evidence the statement made by the confidential source that was contained in the video recording of the first controlled purchase. In support of that argument, defendant asserts first that the State failed to present a proper foundation for the admission of the video recording under the silent witness doctrine. As the State correctly notes, however, defendant has forfeited that assertion on appeal by failing to raise that specific assertion in his posttrial motion in the trial court. See *Enoch*, 122 Ill. 2d at 186; *Allen*, 222 Ill. 2d at 350. We, therefore, will not address defendant's assertion in that regard any further here. As to the merits of this issue, defendant asserts that the admission of the confidential source's statement violated defendant's rights under the confrontation clause because the statement was testimonial hearsay and because defendant was not provided with an opportunity to cross-examine the confidential source about the statement. Due to that alleged error, defendant asks that we reverse his convictions and that we remand this case for a new trial.

¶ 60        The State argues that the trial court's ruling was proper and should be upheld. In support of that argument, the State asserts, although somewhat implicitly, that defendant's confrontation clause claim should be rejected because the video recording was properly admitted under the silent witness doctrine. The State asks, therefore, that we affirm defendant's convictions.

¶ 61        A trial court's ruling on the admissibility of evidence is generally reviewed on appeal for an abuse of discretion. See *People v. Dabney*, 2017 IL App (3d) 140915, ¶ 17. However, a defendant's claim that his constitutional rights under the confrontational clause were violated by the admission of a hearsay statement presents a question of law that is subject to a *de novo* standard of review on appeal. See *id.*

¶ 62        The confrontation clause of the United Sates and Illinois Constitutions guarantees the right of a criminal defendant to confront the witnesses against him or her. See U.S. Const., amend VI; Ill. Const. 1970, art. I, § 8; *People v. Williams*, 238 Ill. 2d 125, 142-43 (2010), *aff'd sub nom.*, *Williams v. Illinois*, 567 U.S. 50, 86 (2012); *Dabney*, 2017 IL App (3d) 140915, ¶ 18. The primary concern of the confrontation clause is with testimonial hearsay. *Williams*, 238 Ill. 2d at 142. Thus, when a court considers a confrontation clause claim, the threshold question is whether the out-of-court statement at issue was testimonial. *People v. Perkins*, 2018 IL App (1st) 133981, ¶ 77. A court need only consider that question, however, if the challenged statement was, in fact, a hearsay statement—a statement offered to prove the truth of the matter asserted. *Williams*, 238 Ill. 2d at 142. The confrontation clause does not bar the admission of testimonial statements that are admitted for purposes other than to prove the truth of the matter asserted. *Id.*

¶ 63        In the present case, after reviewing the video recording of the first controlled purchase, we find that the confidential source's statement contained therein was not being offered to prove the truth of the matter asserted. Indeed, as the parties rightly note, it cannot even be discerned from the video recording what the confidential source stated to defendant when the source first walked up on defendant's property. Obviously, then, the statement was not being admitted for its truth. Rather, it appears that the statement was being admitted to show the effect that it had on the listener (defendant) and to show defendant's intent—that defendant immediately pointed

37

toward Gaines and directed the confidential source to follow Gaines. The statement at issue did not constitute hearsay and, thus, its admission was not barred by the confrontation clause. See *id.* We need not determine, therefore, whether the statement was testimonial. See *id.* Nor do we take any position on the State's argument that satisfying the foundation requirements under the silent witness doctrine would allow the video recording to be admitted, despite any possible confrontation clause problems that existed.

¶ 64                                    III. CONCLUSION

¶ 65        For the foregoing reasons, we affirm: (1) the trial court's denial of defendant's motion to quash and suppress; (2) defendant's convictions on counts II, IV, and V of the charging instrument; and (3) the trial court's ruling on the admissibility of the confidential source's statement contained in the video recording. We reverse, however, defendant's conviction on count I of the charging instrument.

¶ 66        Affirmed in part and reversed in part.